### BEFORE THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **INSIGHT SECURITIES, INC. a Delaware)** | |
| **corporation,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **AMICORP (BVI) TRUSTEES LTD.,** ) | |
| **a British Virgin Islands Company,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff Insight Securities, Inc., by and through its undersigned attorneys, and, for its Complaint against Defendant Amicorp (BVI) Trustees Ltd., states as follows:

1.     Insight Securities, Inc. ("Insight") is a Delaware corporation with its principle place of business in Highland Park.

2.     Defendant Amicorp (BVI) Trustees Ltd. ("Amicorp BVI") is a company incorporated under the laws of the British Virgin Islands with its principle place of business in Tortola, British Virgin Islands that offers certain trust and corporate services and transacts such business throughout the United States, including within the State of Illinois.

3.     At all times relevant hereto Amicorp BVI was the trustee of two offshore trusts, the Vanguardia Trust and the SBH Assets Trust ("SBH Trust"). The claims asserted herein arise from the acts and omissions of Amicorp BVI as trustee of the SBH and Vanguardia Trusts.

4.     Amicorp BVI is wholly owned by Amicorp BVI Limited, a company incorporated under the laws of the British Virgin Islands with its principle place of business in Tortola, British Virgin Islands.

5.     As a result of the acts and omissions of Amicorp BVI, as hereinafter described below, Insight has already incurred over $100,000 in damages and is at risk of incurring an additional $20 million in damages.

6.     This is an action brought to recover the damages in excess of $100,000 already incurred and a declaration that Amicorp BVI is liable to Insight, pursuant to the Illinois Joint Tortfeasors Act, 740 ILCS, 100/1, et seq., pursuant to 28 U.S.C. § 2201.

7.     The amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §1332.

8.     The orders for the securities described herein were effected through Insight's office in Highland Park, Illinois and the damages to Insight suffered by Defendant's actions were (and continue to be) incurred in Highland Park, Illinois. Therefore, venue is properly before the United States District Court for the Northern District of Illinois, Eastern District.

## THE VANGUARDIA TRUST

9.     Vanguardia Group Inc. ("Vanguardia") was incorporated in Belize on January 3, 2001 and on April 21, 2015 was reregistered as an exempt company under the Cayman Islands Companies Law (As Revised) (the "Cayman Law"). Vanguardia acted as a holding company for the Note Issuer entities described below.

2

10.     Until a time when Vanguardia and its assets were transferred to the Vanguradia Trust in 2016, Juan Carlos Cortes ("J. Cortes"), Roberto Cortes ("R. Cortes"), Ernesto Weisson ("Weisson"), and Frank Chatburn ("Chatburn") (collectively "the Biscayne Individuals") owned Vanguardia.

11.     Among other issuers of securities, Vanguardia was the holding company for the following Note Issuers:

    a.  SG Strategic Income Limited ("SG Strategic") was incorporated on March 2, 2010 as an exempt company under the Cayman Law under the name SIF Strategic Income Limited. On April 28, 2010 its name was changed to its current name. The stated objective of SG Strategic was to make and hold investments for the benefit of the investors.

    b.  GMS Global Market Step Up Note Ltd. ("GMS") was incorporated on 5 October 2011 as an exempt company under the Law. GMS's stated objective was to make and hold investments for the benefit of the investors.

    c.  Preferred Income Collaterized Interest Ltd. ("PICI") was incorporated on October 28, 2011 as an exempt company under the Law. PICI's stated objective was to make and hold investments for the benefit of the investors.

    d.  Diversified Real Estate Development Ltd. ("DRED") was incorporated on January 7, 2013 as an exempt limited company under the Law under the name ORC Senior Secured Limited. On February 17, 2017 its name was changed to its current name. DRED's stated objective was to make and hold investments for the benefit of the investors.

DRED, GMS, PICI and SG Strategic are the four note issuer entities which are collectively referred to as the "Note Issuers".

12.     The following securities were issued by the Note Issuers between 2010 and 2017 (hereinafter collectively "the Notes"):

a. Preferred Income Collateralized Interest Ltd. Series 1 and 2 ("PICI "Notes");

b. GMS Global Market Step Up Note Ltd. Series 1, 2, and 3 ("GMS Notes");

c. Two series of SBH Diversified Preferred Income Variable Return Notes ("SBH Notes");

d. ORC Senior Secured Limited Series 1 Step-Up Notes ("ORC Notes"); and

e. DRED Series 1 Variable Return Notes due 2022 ("DRED NOTES").

13.     The Notes could not legally be sold to United States residents but could legally be sold to non-United States residents who maintained accounts with brokerage firms located within the United States and who were duly registered with the Financial Industry Regulatory Authority ("FINRA") such as Insight, Raymond James & Associates, Inc. ("RJ"), and Pershing, LLC ("Pershing").  Such properly registered securities firms could legally execute orders submitted for the accounts of their non-United States residents for the purchase and sale of the Notes, which they did.

**THE SBH ASSET TRUST**

14.     The SBH Trust was, at some time prior to 2015, registered as an exempt company, under the Cayman Law.

15.     In 2014, the Biscayne Individuals owned North Pointe Holdings (BVI) Limited, a British Virgin Island Business entity ("North Pointe"), owns three limited liability companies, Ocean Reef Group, LLC, Ocean Reef Group II, LLC, and Ocean

Reef Group III, LLC that, in turn owned, Cinnamon Cay, LLC, Cinnamon Cay II, LLC, and Cinnamon Prime, LLC.

16. In 2014, the Biscayne Individuals also owned 7940 West Drive LLC, a Florida limited liability Company.

17. Ocean Reef Group, LLC, Ocean Reef Group II, LLC, Ocean Reef Group III, LLC Cinnamon Cay, LLC, Cinnamon Cay II, LLC, Cinnamon Prime, LLC, and 7940 West Drive LLC owned real estate in Florida that are hereinafter collectively referred to as "the Florida properties."

18. North Pointe further owned Biscayne Capital Holdings, Limited, a Bahamian financial services firm ("BCH"), and certain other financial services firms including:

   a. Biscayne Capital (Bahamas), a Bahamian broker/dealer;

   b. Biscayne Capital (BVI), a British Virgin Islands broker dealer that cleared the transactions for its customers through RJ until sometime in 2016; and

   c. Biscayne Capital SA (Uruguay), a broker/dealer in Uruguay ("BC Uruguay") that cleared the transactions for its customers through Pershing until sometime in 2013.

**THE S.E.C. INVESTIGATION AND ORDER**

19. The Biscayne Individuals sold some of the Notes to U.S. Residents through Biscayne Capital International, a United States registered investment advisor ("BCI"), which resulted in an investigation commenced in 2012 by the Securities and Exchange Commission ("S.E.C") of BCI and the Biscayne Individuals.

20.     While negotiating for what would result in severe sanctions against both BCI and themselves, the Biscayne Individuals, together with two Argentinian residents with whom they were working, Fernando Haberer ("Haberer") and Gustavo Trujillo ("Trujillo"), devised a scheme that would give the appearance that the Biscayne Individuals were no longer associated with the Note Issuers, the Notes, and the Florida properties.

21.     By September 2014, the Biscayne Individuals and Haberer had selected the SBH and Vanguardia Trusts as vehicles for this deception and, as discussed below, were in discussion with Amicorp to use both trusts as the owners of the Notes Issuers and the Florida Properties for the purpose of the offering memoranda for the next series of the Notes that they were intending to offer.

22.     As discussed below, Defendant then worked with the Biscayne Individuals and Haberer over the next year to assist the Biscayne Individuals in organizing the Vanguardia and SBH Trust so that the two trusts could be featured in the offering memoranda for the new series of Notes. The Defendant knew that prospective investors and brokerage firms that would be executing orders for the purchase of the new series of the Notes, would be relying on the Defendant to duly execute its duties as Trustee of the Vanguardia and SBH Trusts in making decisions, *i.e.* by investors to purchase the securities and by brokerage firms to accept and execute orders to purchase the Notes.

23.     On or about January 29, 2016 North Pointe transferred its assets to Amicorp BVI to hold on behalf of the SBH Trust, an irrevocable trust.

24.    On March 7, 2016 Vanguardia transferred its assets to Amicorp BVI to hold on behalf of the Vanguardia Trust, an irrevocable trust.

25.    However, as J. Cortes has admitted in a motion filed in a Florida State court action filed by an investor in the Notes (*see* Exhibit "A" hereto) that even though the assets of North Point and Vanguardia were supposedly transferred to the Vanguardia and SBH Trusts, R. Cortes, J. Cortes, and Weisson are the beneficiaries of the Vanguardia and SBH Trusts. Exhibit A hereto at ¶ 11.

26.    Meanwhile, Pershing had ceased clearing transactions for the customers of BC Uruguay in early 2013, when, on information and belief, Pershing became aware of the S.E.C. investigation. Then, in 2015, RJ informed BC BVI that it was ceasing clearing operations in South America. This meant that the Biscayne Individuals need to find another United States broker/dealer to carry its customers' accounts.

27.    The Biscayne Individuals, Haberer, and Trujillo, who had formed Total Advisors, LLC, a Cayman Island registered investment advisor ("Total"), to employ the brokers previously associated with Biscayne Uruguay so that they could act as investment advisors introducing accounts to a broker/dealer located in the United States.

28.    In April 2016, Insight's owner, Carlos Legaspy ("Legaspy"), who was looking to expand the firm's business footprint in Latin American, was placed in contact with Haberer, who explained that the Biscyane Individuals, who re represented had decided to concentrate on real estate development, had decided to

"spinoff" the BC BVI business. As Haberer explained to Legaspy, the Biscayne individuals had transferred the contracts of all of its brokers to Total and that Total was in the process of being sold to Dario Epstein ("Epstein") a former member of the Argentinian equivalent of the S.E.C.

29.     Haberer explained that all Total's customers had, or were in the process of, executing consulting agreements with Total for the purchase and sale of securities for their accounts. Total, according to Haberer, required the services of a registered United States broker/dealer for the customers' accounts.    Total would then compensate Insight with ten percent (10%) of the fees collected.

30.     Insight obtained Total's licenses, its form for consulting agreements, ran checks on the names of the employees of Total and on April 27, 2016, Insight entered into an agreement to provide brokerage services.

31.     On May 27, 2016, the S.E.C. entered a Cease-and-Desist Order in Administrative Proceeding No. 3-17263 (a copy of which is attached as Exhibit "B" hereto) that imposed a bar from the industry of three years for J. Cortes, R. Cortes, and Weisson and a four-year bar on Chatburn and a $78,924 fine with prejudgment interest of $8,052.  BCI was censured, fined $125,000, and order to disgorge $30,024 and prejudgment interest of $3,063.

32.     Haberer had not disclosed the pendency of the S.E.C. investigation to Insight and did not inform Insight of the S.E.C. Order, of which Insight became aware in September 2016. Even when Insight had become aware of the S.E.C. Order, neither Haber nor any of the Total employees were mentioned in the Order.

33.     In or about June 2016, Haberer informed Legaspy that Epstein had decided to only purchase the contracts of the advisors who were servicing customers in Argentina and Uruguay, the two markets with which Epstein said he was familiar. Therefore, Haberer stated to Legaspy that he and Trujillo were forming Pro Advisors, LLC, a Cayman Island registered investment Advisor ("Pro") that would employ the advisors whose customers resided in the remainder of South America and that they would find a different buyer

34.     On July 22, 2019, Insight entered into an agreement to provide brokerage for Pro's customers on the same terms as with Total.

35.     In September 2016, Insight noticed that there was a concentration of, at one time, $160 million invested in Notes in the accounts of customers introduced to Insight by Total and Pro that held approximately $750 million in assets.

36.     Since the Notes were not traded on any exchange, Insight became concerned over the macro risk presented to the firm by that amount of illiquid investments on its books. Therefore, Insight prohibited any futures purchases of the Notes effective January 2, 2017 and instructed Total and Pro to reduce the holdings in the Notes by either selling positions or transferring part of the customer positions elsewhere or both.

37.     The Notes and subsequent notes issued by IACAP Capital Structures (Ireland) ("IACAP Notes") were apparently part of a Ponzi scheme perpetrated by the Biscayne Individuals, Haberer, Trujillo. The restrictions placed by Insight on the purchase of the Notes and then on purchases of IACAP Notes deprived the Ponzi

scheme of new funds and was a material cause of the collapse of the Ponzi scheme. Beginning in July 2017 the Notes began default and by the end September 2017 all the Notes were in default. By early 2018 all of the notes were in liquidation and were, for all practical purposes worthless.

38. At the same time, the various Note Issuers filed Chapter 15 proceedings in the United states Bankruptcy Court for the South District of Florida:

a. In re North Pointe Holdings (BVI) Ltd. (in Liquidation), Case No. 18-24659-AJC;

b. In re Biscayne Capital (B.V.I.) Ltd. (in Liquidation), Case No. 18-24660-AJC;

c. In re Vanguardia Holdings Ltd. (in Liquidation), Case No. 18-24661-AJC;

d. In re Spyglass Investment Management Ltd. (in Liquidation), Case No. 18-24662-AJC;

e. In re Vanguardia Group Inc. (in Official Liquidation), Case No. 18-24663-AJC;

f. In re Sports Aficionados Ltd (in Official Liquidation), Case No. 18-24664-AJC;

g. In re SG Strategic Income Ltd (in Official Liquidation), Case No. 18-24665-AJC;

h. In re GMS Global Market Step Up Note Ltd (in Official Liquidation), Case No. 18-24666-AJC;

i. In re Diversified Real Estate Development Ltd (in Official Liquidation), Case No. 18-24667-AJC;

j. In re Preferred Income Collateralized Interest Ltd (in Official Liquidation), Case No. 18-24668-AJC;

k. In re Sentinel Investment Fund SPC (in Official Liquidation), Case No. 18-24669-AJC; and

l. In re Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation), Case No. 18-24670-AJC.

All of the above Chapter 15 proceedings have been consolidated for administration with the case of In re North Pointe Holdings (BVI) Ltd. (in Liquidation), Case No. 18-24659-AJC, pursuant to Bankruptcy Rule 1015(b).

39. As a result of the default of the Notes, approximately 155 customers of one Pro who reside in Ecuador and who had a Pro advisor who has fled Ecuador and has filed bankruptcy, have initiated two FINRA arbitrations against Insight: <u>George Maalouf Georges, et al. v. Insight Securities, Inc.</u>, FINRA Arb. No. 18-02176 (the Geroges Arbitration") and <u>Ada Serena Cordova Armijos, et al. vs. Insight Securities Inc. and Raymond, James & Associates, Inc.</u>, FINRA Arb. No. 18-02834 ("the Amijos Arbitration"), seeking combined damages of approximately $20 million representing the claimants' losses in the Notes.

## AMICORP'S NEGLIGENT OR WILFUL BREACH OF ITS FIDUCIARY DUTY AS TRUSTEE OF THE VANGUARDIA AND SBH TRUSTS

40. As previously stated in September 2014, the Defendant began discussing with the transfer of assets owned or controlled by the Biscayne Individuals to the Vanguardia and SBH Trust. On September 16, 2014, Defendant sent a template of a BVI VISTA Trust. *See* email string attached as Exhibit "C" hereto at p. 011.

41. A BVI VISTA Trust is:

The BVI VISTA trust is a trust *for settlors who wish to retain control over the administration management and devolution of underlying companies.*

Exhibit "D" hereto at p. 1 (emphasis supplied). Importantly:

The directors or other parties of the underlying company can manage the affairs of the company *without interference from the trustee.*

*Id.* at pp. 1-2 (emphasis supplied); Virgin Islands Special Trust Act, 2003, Section 3(b) ("the management of the company may be carried out by its directors without any

power of intervention being exercised by the trustee"). Thus, the plan, *ab initio*, was to devise a scheme that would give the *appearance* that would give the appearance that Biscayne Individuals had divorced themselves from the Note Issuers when, in fact, they would retain operational control.

42. These discussions were between representatives of the Defendant and J. Cortes, R. Cortes, and Haberer. Specifically, after a meeting on September 19, 2014, the Defendant requested financial statements, organization charts of the Vanguardia and SBH Trusts and the Note Issuers. *See* Exhibit C hereto at p. 001.

43. By February 2016, the Vanguardia and SBH Trust had been fully formed and North Pointe had already transferred its assets to Amicorp BVI to hold on behalf of the SBH Trust, an irrevocable trust on January 29, 2016. And, Defendant was negotiating with Haberer and the Biscayne Individuals to meet in Miami, Florida to "to discuss the modus operandi of the ongoing distributions / accounting and administration purposes" of the two trusts. *See* Exhibit "E" hereto at p.1. Thereafter, Trevor Burke , in his capacity as a director of Defendant attended a meeting in Miami, Florida attended a meeting with one of more of the Biscayne Individuals concerning the administration of the Vanguardia and SBH Trusts.

44. Indeed, Defendant Amicorp BVI was seeking, *inter alia*, to take an ownership interest in "Biscayne", issue bonds, transferring the "Biscayne" financial consultants to an Amicorp "structure", work on new notes issues from a platform in Ireland (*i.e.* IACAP), and establishing an "Amicorp Bank & Trust partnership" with the entites controlled by the Biscayne Individuals. *See Id*.

45. As previously stated, on March 7, 2019, Vanguardia transferred its assets to Amicorp BVI to hold on behalf of the Vanguardia Trust.

46. As discussed, *supra*, on May 27, 2016 the S.E.C. entered the Cease-and-Desist Order attached as Exhibit B hereto. As part of its due diligence, Defendant Amicorp BVI was, on information and belief, aware of the S.E.C. investigation and of the Cease-and Desist Order when its was issued or shortly thereafter.

47. Defendant Amicorp BVI knew that the Biscayne Individuals, Haberer, and Trujillo were, preparing or causing to be prepared, private placement memorandum to be used in the solicitation of new issues of the Notes by the Note Issuers now owned by the Vanguardia Trust to finance the development of real estate owned by the SBH Trust.

48. In addition to the industry bar imposed on the Biscayne Individuals in the Cease-and-Desist Order, the Order described various conflicts of interest and failures by the Biscayne Individuals to make required disclosures (Exhibit B at ¶¶ 35-436, which are incorporated by reference herein and that J. Cortes and R. Cortes made material misrepresentations on BCI's Form ADV. *Id*. at ¶ 6.

49. Defendant Amicorp BVI was aware of the offering memoranda for the series of Notes that would be disseminated once the Defendant formerly accepted its role as Trustee of the Vanguardia and SBH Trusts. On information and belief, agents of the Defendant reviewed each of those offering memorandum.

50. The fact that individuals sanctioned by the S.E.C. for conflicts of interest involving the Note Issuers and for misrepresenting the Form ADV of a registered

investment advisor, BCI, would, pursuant to the VISTA BVI trusts, *i.e.* Vanguardia Trust and SBH Trust ,retain operational control of the Note Issuers and the Florida Properties, thereby determining how the funds raised by the Notes would be spent, was a material fact that required disclosure in the private placement memoranda for the notes.

51.     However, none of the private placement memoranda for the Notes made any disclosure, whatsoever, regarding the fact related in ¶ 50 of this Complaint.

52.     Instead, the private placement memorandum for the Series 3 of the DRED Notes stated at p. 6 that:

> On January 29, 2016 South Bay assigned most of its assets and holdings to North Pointe Holdings (BVI) Ltd. ("North Pointe") and to Amicorp (BVI) Trustees Ltd. to hold on behalf of the SBH Asset Trust, a BVI *irrevocable trust.*
>
> . . . .
>
> Each of the Properties is owned by a special purpose entity, which, in turn, was wholly-owned by South Bay. Currently, the Properties owned by special purpose entities are wholly owned by North Pointe on behalf of the SBH Asset Trust.

Emphasis supplied. The private placement memorandum further stated that:

> On March 7, 2016 Vanguardia Group Inc., the sole owner of the Issuer was contributed to Vanguardia Holdings Ltd. and to Amicorp (BVI) Trustees Ltd. to hold on behalf of the Vanguardia Trust, a BVI *irrevocable trust.*

*Id.* at p. 7 (emphasis supplied). And, without offering any explanation and since the Biscayne individuals retained control over both the Note Issuers and the Florida Properties, the mortgages securing on Florida Properties the Note Issuers were, on information and belief, unrecorded, and that the same properties were securing previous series of the Notes, that:

> The Trust Structure *enhances the collateral position of the investors* and allows for the continued development and maximization of the value of the Trust Fund Assets.

*Id.* (emphasis supplied).

53. The offering memoranda for GMS Series 2 and 3 Notes, PICI Series 2 Notes, and both series of the SBH Notes made the same representations as those contained in ¶ 52, above, and failed to make the disclosures discussed in ¶ 50, above.

54. The failure to disclose the facts set forth in ¶ 50, above, and the purpose of the statements in the private placement memoranda in ¶ 52, above, was to give investors and broker/dealers who were investigating the suitability of orders played for the Notes on the secondary market by their customers that the *irrevocable trust* had placed the assets underlying the Notes and the operations of the Note Issuers beyond the control of the Biscayne Individuals. Defendant Amicorp BVI had a duty as Trustee of the Vanguardia and SBH Trusts to correct these material omissions and misstatements in the private placement memoranda.

55. An additional portion of the S.E.C. Cease-and-Desist Order placed additional responsibilities on Amicorp BVI as Trustee of the Vanguardia and SBH Trusts.

> 25. Between approximately 2007 and late 2009, Weisson and Roberto Cortes, the co-owners of South Bay, spent significant time and resources drafting development plans, seeking permits, and making preparations to develop 17 contiguous lots of the 29 total Resort Lots as a single project. One plan involved developing fractional ownership units. Another plan involved developing a luxury retirement community. However, the single project development plans ultimately did not move forward for various reasons. Consequently, in 2010, South Bay began drafting new development plans to build single family homes on the lots over a six-year period, with rental income starting in late

2012 and home sales starting in 2013 and continuing through 2016. The development delays stretched into the heart of the financial crisis, leaving South Bay with little revenue and increasing carrying costs.[7]

26. As later reported in its audited financials, throughout the Relevant Period, South Bay failed to generate enough revenue or operating cash flows to pay off maturing debt, sustain its operations or fund its development plans without obtaining additional financing. Audits completed subsequent to the Relevant Period showed that South Bay had significant net negative cash flow from operations in 2010, 2011 and 2012. During this period, its annual interest costs rose to approximately $12.6 million in 2010, $10.7 million in 2011, and $11.5 million in 2012.[8] South Bay was also required to renegotiate certain past due financial obligations prior to and during the Relevant Period.[9]

[7]In contrast to the six-year single family home development plan for the Resort lots, South Bay had previously expected all of the homes in the luxury retirement community project to be sold in advance of construction with construction financed by the individuals who purchased the homes and to take 12 to 15 months to complete.

[8]This includes interest incurred and charged to operations as well as interest incurred and capitalized.

[9]The largest past-due obligations concerned loans made by Sentinel to South Bay between 2007 and 2010. The past-due obligations, which exceeded $41 million by September 2010, were renegotiated on several occasions, each time with Roberto Cortes acting on behalf of Spyglass and Sentinel, and Weisson acting on behalf of South Bay.

Exhibit C hereto at ¶¶ 25 and 26.

56. As Trustee of the Vanguardia and SBH Trusts, Defendant Amicorp BVI had the obligation to determine whether the Note Issuers had the ability to meet the obligations imposed by both the existing notes that had been issued and by the new Notes being issued.

57. Amicorp BVI, on information and belief did not review the financial books and records of the Note Issuers nor the existing mortgages on the Florida Properties prior to the issuance of the Notes.

58.     Defendant BVI's silence as to whether the Note Issuers had the ability to fulfill the additional financial obligations imposed by the Notes or whether Defendant Amicorp BVI had even conducted such a review was a material omission that conveyed to the purchasers and the broker/dealers who reviewed the private placement memoranda that the Trustee of the Vanguardia and SBH reasonably believed that the Note Issuers could meet the financial obligations imposed by the Notes.

59.     On August 24, 2017, Defendant Amicorp BVI sent another email to J. Cortes, *one of the Biscayne Individuals*:

> **Subject**:  RE: SBH Trust and Vanguardia Trust
>
>                       . . . .
>
> **Importance**:  High
>
> Dear Sirs,
>
> You will recall that one of the conditions of our acceptance of trusteeship of the Trusts was based on an agreement *that we will receive interim statements and other pertinent financial information on the assets and investments held by the underlying entities owned by the Trusts*. This information would have allowed us to have an informed view of the transactions occurring at the company level given the complex nature of the structure.
>
> As you many recall the Trusts are Vista Trusts and as such the trustee does not get involved with the day to day management of the business operations of the ULEs. Specifically, **'The Trustee shall not bound or required to interfere in the management or conduct of the affairs or business of any company in which the Trust Fund may be invested (and whether or not the Trustee has the control of such company). And so long as no Trustee has notice of willful negligence, willful default or fraud or dishonesty on the part of the directors having the management of such company, it may leave the same wholly to such directors ... )**

We also accepted trusteeship of the Trusts on the condition that at all times *that we would be kept fully informed of all* **investments, activities and transactions** *in order to be in a position to determine at any point whether the assets were enough to cover liabilities. This is very important for us since we do have a fiduciary duty to the beneficiaries of the Trusts to ensure that the ULEs are in a sound financial position to be able to provide distributions to the beneficiaries if and when called upon to do so. It is clear that based on the CS that the assets cannot cover the liabilities and our obligations to the beneficiaries are a grave concern for us.*

Since the conditions of our trusteeship have been clearly breached, we need to understand what immediate plans are in motion to rectify the financial status of the Trust and ULE. In addition, we need to receive supporting documentation for all transactions which occurred at the ULE level so that we can have the statements audited by one of the Big Four Accounting Firms if necessary.

Lastly, but not least we remind you of your current indebtedness to us for our invoices for our services.

We ask that you treat this email as urgent and look forward to hearing from you without delay before accessing what steps we should take in this matter.

Bold in original (emphasis supplied).

60. Thus, over nineteen months after the North Pointe assets were transferred to the SBH Trusts and seventeen months after the Vanguardia assets were transferred to the Vanguardia Trusts, Defendant Amicorp BVI had made no attempt to determine whether the Note Issuers were capable of meeting the financial obligations of the Notes. Indeed, in complete derogation of its admitted fiduciary duty, Defendant Amicorp BVI had not even acquired the documents that would enable it to conduct such an analysis.

61.     Nor, did Defendant Amicorp BVI disclose that it was still relying on the Biscayne Individuals for information and that the Biscayne Individuals were conducting the affairs of the Note Issuers.

62.     On October 17, 2017, after the Notes had defaulted, Defendant Amicorp BVI sent the following email to J. Cortes, *one of the Biscayne Individuals*:

> **Subject**:   RE: SBH Trust and Vanguardia Trust
>                         . . . .
> Importance:  High
>
> Dear Mr. Cortes,
>
> We refer to our previous correspondence in this matter You will recall that *we had previously expressed our concerns about the negative position of the assets to liabilities* and the breach of the terms by which we accepted the trusteeship of the SBH Trust.
>
> You will also recall that *we had requested you to provide us with an action plan on how the position of the financial statements will be rectified. We have not received a reply from you on any of these matters on which we have expressed our concerns* nor have we received payment of the outstanding trustee fees.
>
> Based on the foregoing we think that is appropriate to prepare a Deed of Resignation of Trustee which will appoint you as trustee of the trust and *whereby you assume the fiduciary responsibilities* to the beneficiaries.
>
> We cannot continue to represent this structure given your uncooperation to date.
>
> We urge you provide us with a convenient time to speak this week, in a conference call, as we have repeatedly reached out by phone without success.

Bold in original (emphasis supplied).

63.    At no time did Defendant Amicorp BVI cause the offering memoranda for any of the offering memoranda to be corrected to reflect the concerns expressed in the October 17, 2017 email to J. Cortes.

64.    Had Defendant Amicorp duly executed its fiduciary duty to make full disclosure that the Biscayne Individuals were still in charge of the operation of the Note Issuers and the Florida Properties and had Defendant Amicorp properly and timely reviewed the financial statements of the Note Issuers owned by the Vanguardia Trusts as well as the mortgages on the Florida Properties and the real estate development companies owned by the SBH Trust, Insight would never have processed a single order for the purchase or sale of the Notes or of the sale of the earlier notes issued by the Note Issuers.

## COUNT I
### (Negligence)

65.    Plaintiff realleges Paragraphs 1 through 64, above, as Paragraph 65 of this, Count I, as though fully set forth herein.

66.    At all times relevant hereto, FINRA imposed an obligations on broker/dealers such as Insight to perform reasonable diligence to understand the nature of the recommended security or investment strategy involving a security or securities, as well as the potential risks and rewards, and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. FINRA Rule 2111.05(a).

67.    For that reason, the Note Issuers made the offering memoranda for the Notes available on Bloomberg.

68.     Defendant Amicorp BVI had a duty of care to perform its duties as Trustee of the Vanguardia and SBH Trusts so that potential investors could determine if the Notes were suitable for their investment portfolio and for broker/dealers such as insight to perform the general suitability determination that the Notes were suitable for at least some investors.

69.     Defendant Amicorp BVI breach the duty of care owed Insight by failing to obtain the financial records and perform the analysis of those records to determine whether the Note Issuers could fulfill the financial obligations of the Notes.

70.     As a direct and proximate result of the Defendant Amicorp BVI's breach of its aforesaid duty to Insight, Plaintiff has suffered damages in excess of $1 million.

WHEREFORE, Plaintiff prays that judgement be enter against Defendant and for Plaintiff for at least $1 million in compensatory damages and all taxable costs.

## COUNT II
**(Gross Negligence/Reckless Conduct)**

71.     Plaintiff realleges Paragraphs 1 through 64 and 66 through 70, above, as Paragraph 71 of this, Count II, as though fully set forth herein.

72.     By not having obtained the necessary financial records of the Note Issuers and reviewing the unrecorded mortgages on the Florida Properties securing the Notes for almost a year-and-a-half after the assets were transferred to the Vanguardia and SBH Trusts and after the Notes had begun defaulting, the conduct of Defendant Amicorp BVI so departed from the applicable standard of care that it exhibited such gross negligence or recklessness so as to indicate a wanton disregard of the rights of others.

21

WHEREFORE, Plaintiff prays that judgement be enter against Defendant and for Plaintiff for at least $1 million in compensatory damages, at least $3 million in punitive damages, and all taxable costs.

## COUNT III
### (Fraud)

73.     Plaintiff realleges Paragraphs 1 through 64, above, as Paragraph 73 of this, Count III, as though fully set forth herein.

74.     As herein previously alleged, Amicorp knowingly permitted the Note Issuers to disseminate offering memoranda for the Notes that touted the fact that the assets previously owned by North Pointe and Vanguardia that had been owned and controlled by the Biscayne Individuals had been placed in irrevocable trusts so that potential investors, investment advisors, and broker/dealers would believe that the assets had been placed beyond the control of the Biscayne Individuals who had been barred from the securities industry by the S.E.C.

75.     The Defendant permitted the Note Issuers, through the private placement memorandum of which Defendant was, on information and belief, aware were being disseminated, to mislead the potential investors, investment advisors, and broker/dealers by touting the fact that the north Pointe and Vanguardia assets owned and/or controlled by the Biscayne Individuals had been placed in *irrevocable trusts* but by failing to disclosed the nature of the trusts permitted the settlors of the trusts (the Biscayne Individuals) to maintain control over the Note Issuers, the Florida Properties, the associated real estate developer companies, and financial services firms.

76.     The Defendant likewise concealed the material fact that, prior to the dissemination of the aforesaid private placement memoranda for the Notes, that it had not obtained and reviewed the financial records necessary to determine that the Note Issuers had the ability to meet the financial requirement imposed by the Notes.

77.     The Defendant intended that potential investors, investment advisors, and broker/dealers would rely on this intentional omission of material facts and, specifically, that broker/dealers such as Insight would rely on the materially defective private placement memoranda for the Notes in determine the general suitability of those securities.

78.     Insight reasonably relied on the aforesaid material omissions of material fact and did so to its detriment, incurring as a direct and proximate result of such reasonable reliance $1 million in damages.

79.     WHEREFORE, Plaintiff prays that judgement be enter against Defendant and for Plaintiff for at least $1 million in compensatory damages, at least $3 million in punitive damages, and all taxable costs.

## COUNT IV
### (Declaratory Relief)

80.     Plaintiff realleges Paragraphs 1 through 64, above, as Paragraph 80 of this, Count IV, as though fully set forth herein.

81.     The claimants in both the Georges and Amijos Arbitrations have alleged, inter alia, that Insight was negligence in executing orders for the purchase of the Notes for their accounts in that Insight was negligent in not knowing the information concerning the inability of the Note Issuers to honor their obligations

under the Notes. The total damages being sought in the Georges and Amijos arbitrations exceeds $20 million.

82. The Illinois Joint Tortfeasors Act, 740 ILCS 1, *et seq.*, provides that:

Sec. 2. Right of Contribution. (a) Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them.

Section 3 of the Illinois Joint Tortfeasors Act states

Sec. 3. Amount of Contribution. The pro rata share of each tortfeasor shall be determined in accordance with his relative culpability. However, no person shall be required to contribute to one seeking contribution an amount greater than his pro rata share unless the obligation of one or more of the joint tortfeasors is uncollectable. In that event, the remaining tortfeasors shall share the unpaid portions of the uncollectable obligation in accordance with their pro rata liability.

83. Since Defendant is not a FINRA registrant, FINRA lacks jurisdiction for the arbitrators to make any binding determination of relative culpability.

84. Defendant has denied all culpability for the losses suffered by the Plaintiffs' customers who purchased the Notes.

85. Therefore, an actual case or controversy exist between the Plaintiff Defendant over how much an award in the Georges and Amijos Arbitrations against Insight is Defendant liable to Insight, if any, pursuant to 740 ILCS 100/3.

WHEREFORE, Plaintiff prays that this Court declare the relative culpability of Defendant for any losses suffered by the claimants in the Georges and Amijos Arbitrations.

September 24, 2019

Respectfully Submitted

One of Plaintiff's' attorneys

Nicholas P. Iavarone
The Iavarone Firm, P.C.
33 North LaSalle, Suite 1400
Chicago, IL 60602
(312) 63 7-9466
(800) 417-0580 (fax)
niavarone@iavaronefirm.com

Laurence M. Landsman
The Landsman Law Firm
33 North LaSalle, Suite 1400
Chicago, IL  60602
312) 251-1144
(312) 251-1147 (fax)
larry@landsmanfirm.com

# Exhibit "A"

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX LITIGATION DIVISION

CASE NO. 2018-CA-035014-CA-01

DIEGO ROMAY, *et al.*,                 )
                                       )
    Plaintiffs,                        )
                                       )
v.                                     )
                                       )
SOUTH BAY HOLDINGS, LLC, *et al.*,     )
                                       )
    Defendants.                        )
_____ /

## MOTION TO STAY

Defendant Juan Carlos Cortes ("Mr. Cortes"), hereby moves to stay[1] the instant action, pending resolution of the foreign liquidation proceedings and the Chapter 15 bankruptcy proceedings presently pending in the United States Bankruptcy Court for the Southern District of Florida, stating:

### INTRODUCTION

This case stems from an alleged $300 million Ponzi scheme. According to the Complaint, the defendants defrauded an untold number of investors, including Plaintiffs, of hundreds of millions of dollars. However, the same alleged scheme is already the subject of liquidation proceedings in the Cayman Islands, the British Virgin Islands, and Bermuda. The liquidators in those proceedings have filed a petition, pursuant to Chapter 15 of the United States Bankruptcy

---

[1] By filing this motion to stay, Mr. Cortes does not waive any of his defenses, all of which are expressly preserved. If the Court does not grant a stay, Mr. Cortes moves this Court to provide a deadline of twenty (20) days from the date of the order denying the motion for Mr. Cortes to respond to the Complaint. Mr. Cortes also reserves the right to join in any defenses raised in filings by other defendants.

Code, in the United States Bankruptcy Court for the Southern District of Florida, asking the Bankruptcy Court to recognize the foreign proceedings. On January 11, 2019, the Bankruptcy Court entered an Order officially recognizing the foreign proceedings. The Liquidators have been appointed to trace, recover, and secure the assets that might be available to repay the alleged victims and to distribute those assets in an equitable manner. By filing this lawsuit, Plaintiffs are attempting to cut to the front of the line and improperly take a disproportionate share of the assets, to the detriment of other alleged victims. They should not be allowed to do so.

### RELATIONSHIPS BETWEEN RELEVANT ENTITIES

1.      Sometime before 2004, Defendants Roberto Cortes ("R. Cortes") and Ernesto Weisson ("Wession") created Vanguardia Group, Inc ("Vanguardia Goup").

2.      In or about 2004, Defendants R. Cortes and Weisson created Defendant South Bay Holding, LLC ("South Bay").

3.      In or about 2006, Defendants R. Cortes and Weisson gifted to Mr. Cortes a 10% interest in Vanguardia Group. At the time, Vanguardia Group did not have assets. However, between 2007 and 2013, Vanguardia Group became 100% owner of 5 special purpose vehicles domiciled in the Cayman Islands: Sentinel Investment Fund SPC, GMS Global Market Step Up Note, Ltd., SG Strategic Income, Ltd., Preferred Income Collateralized Interest, Ltd, and Diversified Real Estate Development, Ltd. (collectively, the "SPVs").

4.      In or about 2007, Defendants R. Cortes, Weisson, and Mr. Cortes created Defendant Biscayne Group Holdings, LLC ("Biscayne Group"). South Bay was the majority owner of Biscayne Group. Defendant Weisson and Mr. Cortes were minority owners.

5.      In 2012, Biscayne Group transferred all of its assets to Biscayne Capital Holdings, Ltd. ("Biscayne Capital"). South Bay was also majority owner of Biscayne Capital.

CASE NO. 2018-035014-CA-01

6.      In or about 2015, South Bay and Biscayne Capital hired Defendant Amicorp (BVI) Trustees, Ltd. ("Amicorp") to create and serve as trustees for two BVI trusts, the SBH Asset Trust and the Vanguardia Trust.

7.      In or about 2016, Defendant Amicorp created North Pointe Holdings (BVI), Ltd. ("North Pointe"), as the owner of the assets of the SBH Asset Trust. South Bay then transferred all of its assets to North Pointe. South Bay's assets consisted of real estate holdings and the majority interest of Biscayne Capital. Defendant Amicorp presently owns 100% of the interest in North Pointe.

8.      Also in or about 2016, Defendant Amicorp created Vanguardia Holdings, Ltd ("Vanguardia Holdings"), as the owner of the assets of the Vanguardia Trust. Vanguardia Group then transferred all of its shares to Vanguardia Holdings. As a result, Vanguardia Holdings became the owner of Vanguardia Group, as well as all of Vanguardia Group's assets, which consisted of the SPVs. Defendant Amicorp presently owns 100% of the shares of Vanguardia Holdings.

9.      The assets of North Pointe are exclusively those transferred to it from South Bay. Vanguardia Group is the sole asset of Vanguardia Holdings.

10.     The assets of North Pointe consist solely of assets transferred to it by South Bay. The assets of Vanguardia Holdings, consist solely of shares transferred to it by Vanguardia Group (owner of the SPVs). The assets of South Bay and Vanguardia Group, in turn, belonged to Defendants South Bay, Biscayne Group, R. Cortes, Weisson, and Mr. Cortes.

11.     R. Cortes, Weisson, and Mr. Cortes are also beneficiaries of the SBH Asset Trust and the Vanguardia Trust.

CASE NO. 2018-035014-CA-01

RELEVANT PROCEDURAL BACKGROUND

12.     On or about August 31, 2018, Defendant Amicorp placed North Pointe and Vanguardia Holdings into voluntary liquidation.  Michael Pearson and Stephen Briscoe of Fund Fiduciary Partners (the "Liquidators") were appointed the liquidators.

13.     On or about October 5, 2018, the Liquidators commenced liquidation proceedings of the SPVs in the Cayman Islands.

14.     Although the exact commencement date is unclear, Biscayne Holdings is also presently subject to liquidation proceedings in Bermuda.  (The entities presently in liquidation, North Pointe and Vanguardia Holdings in the BVI, the SPVs in the Cayman Islands, and Biscayne Capital in Bermuda shall collectively be referred to as the "Debtors.").

15.     On or about November 26, 2018, the Liquidators filed a petition, pursuant to Chapter 15 of the United States Bankruptcy Code, asking the Bankruptcy Court for the Southern District of Florida, to recognize the foreign proceedings.  (Copies of the petition and related verified motion are attached as composite "Exhibit A.")

16.     The Liquidators allege that Chapter 15 protection is necessary because:

> the Debtors were under common control and controlled **for the common benefit of the Principals**. The Debtors collectively raised a significant amount of money from third party creditors, which was intended to be deployed for the purpose of real estate and related investments, both inside and outside the United States. However, much of the money that was raised has been dissipated and, currently, the creditors of each of the Debtors stand to suffer a near total loss of their invested capital.

Ver. Mot. Pet. for Ch. 15 Rec., ⁋ 41 (emphasis added).

17.     The Liquidators define the term "Principals" to include the defendants here, R. Cortes, Weisson, and Mr. Cortes.  *Id.* at ⁋ 5.

18.     Among other things, the Liquidators request an injunction:

> prohibiting all persons and entities, other than the Petitioners and their representatives, attorneys, and agents, from: (i) commencing or continuing an action or proceeding concerning any of the Debtors' assets, rights, obligations, or liabilities; (ii) executing against any of the Debtors' assets; (iii) taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff, or other claim against the Debtors or their property; (iv) transferring, relinquishing, or disposing of any property of the Debtors to any person or entity other than the Petitioners; or (v) declaring or considering the commencement of the Foreign Proceeding or the Debtors' chapter 15 case a default under any agreement, contract, or arrangement . . . .

*Id.* at ¶ 49(c).

19.     On January 19, 2019, the Bankruptcy Court entered an Order, recognizing the foreign proceedings and granting the relief sought by the Liquidators. (A copy of the Order is attached as "Exhibit B.")

20.     The Bankruptcy Court further held that the Liquidators are entitled to the relief provided in 11 U.S.C. §§ 1520(a) and 1521(a) and any further relief warranted by principles of comity. Order, ¶¶ J-L.

### MEMORANDUM OF LAW

**I.     The Court should stay the action under 11 U.S.C. § 1521(a).**

11 U.S.C. § 1520 provides for certain automatic relief upon recognition of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property. 11 U.S.C. § 1520(a)(1) ("Upon recognition of a foreign proceeding that is a foreign main proceeding sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States . . . ."). A bankruptcy court is also empowered under 11 U.S.C. § 1521(a) to "grant any appropriate relief" necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors" 11 U.S.C. 1521(a) ("Upon recognition of a foreign proceeding, whether main or

nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a); staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) . . . .").

Although Plaintiffs have carefully attempted to plead around the automatic stay by not naming the bankruptcy Debtors themselves, the assets that Plaintiffs will ultimately seek to execute upon if they obtain a judgment are precisely the assets of the Debtors. For example, a judgment against Defendant South Bay will inevitably lead to execution proceedings against the assets of Debtor SBH Asset Trust and, in turn, against Debtor North Pointe. Similarly, a judgment against Defendants R. Cortes, Weisson, or Mr. Cortes will inevitably lead to execution proceedings against the assets of the Debtor Vanguardia Trust and, in turn, Debtor Vanguardia Holdings and the Debtor SPVs. Plaintiffs here should not be allowed to cut the line. Accordingly, the automatic stay provision of Section 1520 should apply, and this case should be stayed. Alternatively, the case should be stayed under the much more flexible Section 1521, which authorizes any relief that works to serve the interests of the Chapter 15 proceedings.

**II.** **These proceedings should be stayed under principles of international comity.**

"Comity principles dictate that an action should be stayed, and a trial court departs from the essential requirements of law by failing to grant such a stay, when the first-filed lawsuit involves substantially similar parties and substantially similar claims." *Pilevsky v. Morgans Hotel Group, Mgmt., LLC*, 961 So. 2d 1032, 1035 (Fla. 3d DCA 2007). Put differently, "[a]lthough a trial court has broad discretion to order or refuse a stay of an

action pending before it, it is nonetheless an abuse of discretion to refuse to stay a subsequently filed state court action in favor of a previously filed state action which involves the same parties and the same or substantially similar issues." *Id.* at 1034-35. In addition, "Florida law is clear that, the causes of action do not have to be identical to require a stay of the second-filed action. *Id.* at 1035. Rather, "[i]t is sufficient that the two actions involve a single set of facts and that resolution of the one case will resolve many of the issues involved in the subsequently filed case." *Id.*

Here, the Liquidators commenced liquidation proceedings of North Pointe and Vanguardia Holdings on August 31, 2018. The Liquidators commenced liquidation proceedings of the SPVs on October 5, 2018. Plaintiffs did not file their Complaint until October 24, 2018. The allegations made by Plaintiffs in the Complaint are among the many issues that the Liquidators are investigating in the earlier-filed foreign proceedings. While the cases are not identical, the disposition of the earlier-filed foreign proceedings will resolve many of the issues raised by Plaintiffs here. Accordingly, principles of comity require a stay. *Id.* at 1036 (holding trial court abused its discretion in denying motion to stay where, as here, resolution of earlier-filed proceedings would resolve many of the issues raised in the later-filed case).

## III. __The Court should stay the action under its inherent authority__.

The Court has broad inherent discretion to stay proceedings. *REWJB Gas Invs. v. Land O' Sun Realty, Ltd.*, 643 So. 2d 1107, 1108 (Fla. 4th DCA 1994) ("The granting of a stay of proceedings by a trial court, pending the outcome of an action in another court, is in the broad discretion of the trial court."); *Onett v. Ahola*, 780 So. 2d 979, 980 (Fla. 5th DCA 2001) (holding

that the decision to stay a case is left to the discretion of the court and will only be disturbed upon a showing of an abuse of discretion).

Here, counsel for the Liquidators has indicated that the Liquidators are presently considering whether to intervene in this case and/or whether to remove this action to the bankruptcy proceeding. Among other things, it would result in a waste of judicial resources and the parties' time and money to embark on document discovery, depositions, and motion practice only for the Liquidators to intervene in this case or remove the case to the bankruptcy proceedings. Accordingly, at a minimum, the Court should exercise its broad discretion and temporarily stay the case until the Liquidators intervene and/or remove the case or the time do so has lapsed.

WHEREFORE, Mr. Cortes respectfully requests that the Court enter an Order staying this case, pending resolution of the foreign/bankruptcy proceedings.

Respectfully submitted,

THE LAW OFFICES OF ALEXANDER F. FOX, P.A.
201 ALHAMBRA CIRCLE, SUITE 1200
CORAL GABLES, FLORIDA 33134
TEL. (305) 224-1003

BY: /s/ *Alexander F. Fox*
ALEXANDER F. FOX
FLORIDA BAR NO. 167886
ALEXFOX@ALEXANDERFOXLAW.COM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail through the Florida Courts E-Filing Portal, this 18th day of January, 2019, to all counsel of record.

/s/ *Alexander F. Fox*
ALEXANDER FOX

EXHIBIT A

| Fill in this information to identify the case: |
|---|
| United States Bankruptcy Court for the: |
| <u>Southern</u> District of <u>Florida</u> |
| (State) |
| Case number (*If known*): _____ Chapter 15 |

☐ Check if this is an amended filing

<u>Official Form 401</u>

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

**1. Debtor's name**
<u>North Pointe Holdings Ltd. - In Liquidation</u>

**2. Debtor's unique identifier**

For non-individual debtors:

☐ Federal Employer Identification Number (EIN) _____ – _____

☒ Other <u>1904975</u>. Describe identifier <u>Company No.</u>

For individual debtors:

☐ Social Security number: XXX - XX– _____

☐ Individual Taxpayer Identification number (ITIN): 9 XX - XX - _____

☐ Other _____. Describe identifier _____

**3. Name of foreign representative(s)**
<u>Stephen Briscoe and Michael Pearson - Joint Official Liquidators</u>

**4. Foreign proceeding in which appointment of the foreign representative(s) occurred**
<u>Section 178(1)(d) of the Insolvency Act, 2003</u>

**5. Nature of the foreign proceeding**

*Check one:*

☒ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

**6. Evidence of the foreign proceeding**

☐ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☒ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.
<u>Verified Petition Under Chapter 15 for Recognition of Foreign Proceeding</u>
<u>and supporting Declaration filed in support thereof.</u>

**7. Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

☒ Yes

| Debtor | North Pointe Holdings Ltd. - In Liquidation | Case number (if known) |
|---|---|---|
| | Name | |

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii)   all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

British Virgin Islands

**Debtor's registered office:**

2nd Floor TICO Building
Wickhams Cay II
Number    Street

P.O. Box 4441
P.O. Box

Road Town, Tortola, VG 1110
City    State/Province/Region    ZIP/Postal Code

British Virgin Islands
Country

**Individual debtor's habitual residence:**

_____
Number    Street

_____
P.O. Box

_____
City    State/Province/Region    ZIP/Postal Code

_____
Country

**Address of foreign representative(s):**

2nd Floor TICO Building
Wickhams Cay II
Number    Street

P.O. Box 4441
P.O. Box

Road Town, Tortola, VG 1110
City    State/Province/Region    ZIP/Postal Code

Cayman Islands
Country

**10. Debtor's website** (URL)

_____

**11. Type of debtor**

*Check one:*

☒ Non-individual (*check one*):

   ☒ Corporation. Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ☐ Partnership

   ☐ Other. Specify: _____

☐ Individual

| Debtor | North Pointe Holdings Ltd. - In Liquidation | Case number (if known) |
|--------|---------|---------|
|        | Name |  |

**12. Why is venue proper in this district?**

Check one:

- [X] Debtor's principal place of business or principal assets in the United States are in this district.

- [ ] Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

  _____

- [ ] If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

  _____

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ _____     Stephen Bricoe
   Signature of foreign representative        Printed name

Executed on    11/23/2018
               MM  / DD / YYYY

✗ _____     Michael Pearson
   Signature of foreign representative        Printed name

Executed on    11/23/2018
               MM / DD / YYYY

**14. Signature of attorney**

✗ /s/ Eduardo F. Rodriguez          Date    11/26/2018
   Signature of Attorney for foreign representative       MM  / DD / YYYY

Eduardo F. Rodriguez
Printed name

EFR Law Firm
Firm name

1548          Brickell Avenue
Number        Street

Miami                                    FL          33129
City                                     State       ZIP Code

(305) 340-0034                           eddie@efrlawfirm.com
Contact phone                            Email address

36423                                    FL
Bar number                               State

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

In re:               )
                  )    Chapter 15

North Pointe Holdings (BVI) Ltd. (in   )
Liquidation), [1]             )    Case No. 18-24659-AJC
                  )
    Debtor in a Foreign Proceeding.   )

## VERIFIED PETITIONS FOR ORDERS RECOGNIZING FOREIGN MAIN PROCEEDINGS AND GRANTING ADDITIONAL RELIEF AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Michael Pearson of FFP Limited and Hadley Chilton of FFP (BVI) Limited, in their capacities as Joint Official Liquidators (the "***Cayman Islands Petitioners***") of Diversified Real Estate Development Ltd (in Official Liquidation); GMS Global Market Step Up Note Ltd (in Official Liquidation); Preferred Income Collateralized Interest Ltd (in Official Liquidation); Sentinel Investment Fund SPC (in Official Liquidation); SG Strategic Income Ltd (in Official Liquidation); Sports Aficionados Ltd (in Official Liquidation); and Vanguardia Group Inc (in Official Liquidation) (the "***Cayman Islands Debtors***"), Michael Pearson of FFP Limited and Stephen Briscoe of FFP (BVI) Limited, in their capacities as Joint Liquidators (the "***British Virgin Islands Petitioners***") for Vanguardia Holdings Ltd. (in Liquidation), Spyglass Investment Management Ltd. (in Liquidation), North Pointe Holdings (BVI) Ltd. (in Liquidation), and Biscayne Capital (B.V.I.) Ltd. (in Liquidation) (the "***British Virgin Islands Debtors***"), and

---

[1] On November 27, 2018, Debtor North Pointe Holdings filed a Motion for Joint Administration in 11 other related Chapter 15 Cases including Biscayne Capital (BVI) - In Liquidation, Case No. 18-24660-RAM; Vanguardia Group Inc. - In Official Liquidation, Case No. 18-24663-RAM; SG Strategic Income Limited - In Official Liquidation, Case No. 18-24665-RAM; Sentinel Investment Fund SPC - In Official Liquidation, Case No. 18-24669-RAM; Biscayne Capital Holdings Limited - In Creditor Voluntary Liquidation, Case No. 18-24670-RAM; Spyglass Investment Management Ltd. in Liquidation, Case No. 18-24662-LIM; Sports Aficionados Ltd. - In Official Liquidation, Case No. 18-24664-LIM; Diversified Real Estate Development Ltd. - In Official Liquidation, Case. No. 18-24667-LIM; Preferred Income Collateralized Interest Ltd. – In Official Liquidation, Case No. 18-24668-LIM; Vanguardia Holdings Ltd. - in Liquidation, Case No. 18-24661; and GMS Global Market Step Up Note Ltd. - In Official Liquidation.

Michael Pearson of FFP Limited and Stephen Briscoe of FFP (BVI) Limited, in their capacity as Creditor Voluntary Liquidators (the "**Bermuda Petitioners**" and together with the Cayman Islands Petitioners and British Virgin Islands Petitioners, the "**Petitioners**" or the "**Liquidators**") of Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation) (the "**Bermuda Debtor**" and together with the Cayman Islands Debtors and the British Virgin Islands Debtors, the "**Debtors**"), respectfully file official form petitions and these verified petitions (together, collectively, the "**Petitions**") for an order in the form attached hereto as <u>Exhibit A</u>, recognizing the foreign liquidation proceedings of each of the Debtor (each a "**Proceeding**") as a foreign main proceeding under section 1517 of title 11 of the United States Code (the "**Bankruptcy Code**") and granting certain additional relief under section 1521 of the Bankruptcy Code.

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

2.      These cases have been properly commenced under section 1504 of the Bankruptcy Code by filing the Petitions in accordance with section 1515 of the Bankruptcy Code.

3.      As further set forth in the Declaration of Michael Pearson in Support of Petition for Order Recognizing Foreign Main Proceeding and Granting Additional Relief (the "**Pearson Declaration**"), which is filed contemporaneously with these Petitions and incorporated herein, the Petitioners have reason to believe that: (i) certain of the Debtors have assets in this district, including without limitation, membership interests in Florida limited liability companies, membership interests in country clubs located in the State of Florida, and/or claims against certain parties located in the State of Florida; and/or (ii) venue in the State of Florida for these

cases comports with the interests of justice and the convenience of the parties, having regard for the relief sought by the Foreign Representatives in these petitions. Venue is therefore proper under 28 U.S.C. § 1410. *See* Pearson Declaration at 2–3.

4.      The statutory predicates for relief are sections 1504, 1515, 1517, 1520, and 1521 of the Bankruptcy Code.

## II.      BACKGROUND

### A.      Background of FFP's Involvement with the Debtors and Related Entities Prior to their Appointment as Liquidators.

5.      Attached as <u>Exhibit B</u> to the Pearson Declaration are organizational charts for the Debtors and certain related companies, which were produced to the Liquidators by the Debtors' former management. As set forth therein, the Debtors are all collectively owned either by Vanguardia Trust (BVI), a British Virgin Islands trust, or SBH Trust (BVI), also a British Virgin Islands trust (together, the "***Trusts***"). Both of the Trusts have a common set of beneficiaries: Mr. Ernesto Weisson, Mr. Roberto Cortes, Mr. R. Cortes Rueda, and Mr. J.C. Cortes Pablo (collectively the "***Beneficiaries***" or the "***Principals***"). Mr. Pearson has been appointed as Protector for both of the Trusts under British Virgin Islands law. Under British Virgin Islands law, a Protector may be appointed over a trust to limit the scope of powers of the trustees and/or to require the trustees to obtain the consent of the Protector prior to taking certain actions.[2]

---

[2] These Verified Petitions contain material discussions of foreign law. Under Rule 44.1 of the Federal Rules of Civil Procedure, incorporated into these cases pursuant to Federal Rule of Bankruptcy Procedure 9017, this Court may determine issues of foreign law and the Court may consider "any relevant material or source, including testimony." The Foreign Representatives respectfully submit that they are not asking this Court to decide any issues of foreign law, but rather apply foreign law to determine the issues presented in these Verified Petitions. To assist the Court, the Pearson Declaration provides extensive discussion of applicable Cayman Islands, British Virgin Islands, and Bermuda law, including true and correct copies of relevant portions of the underlying statutes. The Foreign Representatives will file a separate notice of these matters pursuant to Federal Rule of Bankruptcy Procedure 9017.

6.     In addition to each of the Debtors, the Trusts also, directly or indirectly, own entities incorporated in the State of Florida, as well as entities organized under the laws of Argentina, Spain, Switzerland, Uruguay, Ecuador, and the Bahamas.  Until its resignation in August 2018, SGG Management (BVI) Ltd ("*SGG*") acted as Director for most of the companies owned by the Trusts, including all of the Debtors and Amicorp (BVI) Trustees Ltd. acted as Trustee for the Trusts, and in such capacity as sole shareholder of North Pointe Holdings (BVI) Ltd. (in Liquidation) and Vanguardia Holdings Ltd. (in Liquidation).  In relation to certain entities, individuals employed by SGG acted as directors.

7.     FFP was initially retained as a consultant by the Debtors in March 2018 to assist SGG in collecting the books and records of the entities owned by the Trusts.  FFP contacted various former service providers, but was only able to obtain limited books and records for certain of the companies owned by the Trusts.  SSG thereafter submitted their resignation on July 3, 2018, which resignation became effective as of August 3, 2018.

8.     At that time, Amicorp determined that it was appropriate to place the companies owned by the Trusts into liquidation proceedings and to appoint the Liquidators for each of the companies owned by the Trusts.  Amicorp initially appointed Stephen Briscoe and Michael Pearson as Liquidators of Vanguardia Holdings Ltd. and North Pointe Holdings (BVI) Ltd. on August 31, 2018.  Since their initial appointment on August 31, 2018, the Liquidators have been appointed over each of the Debtors as set forth in the documents attached as Exhibit A to the Pearson Declaration.

**B.     Current Understandings Concerning the Debtors' Business.**

9.     Based upon the Liquidators' current understanding, from approximately 1999 through 2007, the Principals attempted to develop real estate projects in Florida through an entity

- 4 -

known as South Bay Holdings, LLC ("**South Bay**"). South Bay is not a Debtor, but based upon the best information available to the Liquidators, was wholly owned by two of the Principals. When South Bay was originally founded, it financed its activities primarily through bank loans and "friends and family" money.

10. The Liquidators understand from records that in 2006 and 2007, South Bay sought to significantly expand its business, including, amongst other business investments, by acquiring 29 lots and associated memberships at an exclusive resort in Key Biscayne, Florida. Starting around this time, the Principals began to form certain special purpose vehicles to sell notes (the "**Notes**") that were intended to support these development activities. The Notes were issued in multiple series through SG Strategic Income Ltd., GMS Global Market Step Up Note Ltd., and Preferred Income Collateralized Interest Ltd., each of which is a Debtor herein. Collectively, these three entities appear to have issued not less than $260 million of these Notes; however, the actual number is yet to be verified by transaction records and statements which have not yet been received.

11. Certain other entities that are also Debtors herein were otherwise involved with the issuance of the Notes. For instance, Spyglass Investment Management, Inc. acted as an investment advisor related to the issuance of the Notes. Spyglass is a Debtor in these proceedings. Similarly, the Principals created several other financial services entities, all under the name "Biscayne Capital" that marketed the Notes to third party investors. These entities include the following, all of which are entities in these proceedings: Biscayne Capital Holdings Limited, a Bermuda entity, and Biscayne Capital (B.V.I.) Ltd., a British Virgin Islands company. These "Biscayne Capital" entities also include numerous entities that are not Debtors in these proceedings, including (i) Biscayne Capital International, LLC, which, to the best of the

Liquidators' knowledge was a Florida limited liability company that is no longer in business; (ii) Biscayne Capital Ltd, a Bahamian entity over which Deloitte has been appointed liquidator by the Securities Commission of the Bahamas, (iii) Biscayne Capital SA and BisCap SRL, which are entities that are organized under the laws of Uruguay; and (iv) Biscayne Capital (Switzerland) AG, a Swiss entity. Biscayne Capital Holdings, Limited, the Bermuda entity, is the direct parent of all other "Biscayne Capital" entities.

12. Starting no later than 2016, the U.S. Securities and Exchange Commission (the "**SEC**") commenced an investigation of the Principals, Biscayne Capital International, LLC, and others concerning the issuance and marketing of the Notes. This investigation led to the entry of an *Order Instituting Administrative Cease-and-Desist Proceedings, Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisors Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanction and a Cease-and-Desist Order* (the "**SEC Order**") against Biscayne Capital International, LLC, Roberto Cortes, Ernesto Weisson, Juan Carlos Cortes, and Frank R. Chatburn. A copy of the SEC Order is attached as <u>Exhibit C</u> to the Pearson Declaration. The SEC Order arose as a result of the failure of Biscayne Capital International, LLC, formerly a U.S. registered investment advisor, to disclose conflicts of interest and other material information in connection with the sale of Notes between August 2010 and March 2012. These acts and omissions included, without limitation, failure to disclose that the Principals held a beneficial interest in both Biscayne Capital International, LLC, the issuers of the Notes, and South Bay, which was the beneficiary of the proceeds from the sale of the Notes. Similarly, the SEC Order found that there was inadequate disclosure to investors of South Bay's financial position, which at all relevant times was precarious.

13.     Finally, and related to the above, North Pointe Holdings (BVI) Limited, is a British Virgin Islands company and a Debtor herein.  North Pointe Holdings (BV) Limited holds interests in a number of Florida limited liability companies, all of which share the names "Ocean Reef Group" or "Cinnamon."  These entities hold, collectively, the Debtors' remaining interests in certain properties and club memberships in Key Biscayne, Florida.   The Liquidators understand that North Pointe Holdings (BVI) Limited acquired these interests directly from South Bay.  Many of these properties and club memberships are subject to mortgages and other encumbrances and the net liquidation value of these assets that will be available to North Pointe Holdings (BVI) Limited is uncertain at this time.  The Liquidators have also been asked to look into the circumstances and transactions involved in encumbering these assets.

### C.     FFP's Activities Since Appointment as Liquidators

14.     Since being appointed, the Liquidators have been taking active steps to secure the Debtors' books and records, understand the Debtors' asset and liability position, manage the Debtors' assets to realize proceeds for the benefit of the Debtors' estates, communicate with creditors and other investors, and otherwise commence an investigation into the circumstances which led to the commencement of the liquidation proceedings.

15.     As an initial matter, the Debtors' current financial and operational condition bears mention.  It is tenuous.  Upon the Liquidators' appointment, there were no material liquid assets and no effective management of the Debtors.  Since the Liquidators' appointment, they have identified the assets held directly or indirectly through North Pointe Holdings (BVI) Limited (the property and club memberships in Key Biscayne, Florida) as the Debtors' only "tangible asset." This stands in sharp contrast to the funds raised from third party investors, which the Liquidators collectively believe was in the region of $300 million and may have been more.

16.     The Liquidators have also begun the process of attempting to obtain the books and records for each of the Debtors.  They have written informally to many of the former service providers for the Debtors, both directly and through U.S. counsel.  Certain of these service providers have been cooperating voluntarily.  However, many have not and the Liquidators anticipate having to serve subpoenas or other legal process to obtain records related to the Debtors.  As discussed below, the Liquidators anticipate that many of these entities will only respond and provide the Liquidators with documents upon service of a subpoena and, potentially, enforcement of the same by this Court.

17.     The Liquidators have also spent significant amounts of time communicating with investors and other creditors of the Debtors.  Many of the investors invested substantial personal and family sums into the Debtors – in certain cases as much as $50 million.  These investors and creditors have been a valuable source of information to the Liquidators and the Liquidators anticipate that certain of these investors and creditors may be active in these chapter 15 proceedings, in addition to having filed their own litigation.  For instance, Diego Romay, on his own behalf and as guardian for certain minor children, as well as other affiliated investors, has recently commenced a civil action in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "***Romay Action***").  The Romay Action seeks damages for in excess of $40 million and names the Principals, South Bay, Biscayne Group Holdings, LLC, certain Amicorp entities, and other parties.  The Romay Action does not, however, name any of the Debtors in this proceeding (and, as such, would not be stayed by the recognition of the Proceedings under chapter 15).

D.    **The Chapter 15 Proceeding**

18.    The Liquidators have determined to commence these chapter 15 proceedings for each of the Debtors because they believe that such proceedings are in the best interests of each of the Debtors and such proceedings are necessary to advance the liquidations, conduct an investigation into the Debtors' pre-liquidation activities, and otherwise maximize the likelihood of recovering material assets for the benefit of investors and creditors of the Debtors.    As discussed below, each of the Proceedings should be recognized as a "foreign main proceeding" within the meaning of 11 U.S.C. § 1502.

19.    The Cayman Islands, the British Virgin Islands, and Bermuda are all British Overseas Territories and are part of the Commonwealth of Great Britain.  The Cayman Islands and Bermuda each have their own court systems; the British Virgin Islands is a member of the Eastern Caribbean Supreme Court system.  In each jurisdiction, orders issued by the respective courts are ultimately appealable to the Judicial Committee of the Privy Council, which is seated in London.

20.    The primary relevant sources of law for each of the Proceedings are as follows: (i) with respect to the Cayman Islands Debtors, the Companies Law and the Companies Winding Up Rules (the "*CWR*"); (ii) with respect to the British Virgin Islands Debtors, the BVI Business Companies Act, the BVI Business Companies Regulations, and the BVI Insolvency Act; and (iii) with respect to the Bermuda Debtor, the Companies Act and the Companies (Winding Up) Rules, each as enacted in the relevant jurisdiction.  A summary of the relevant legislation applicable to each of the Proceedings is set forth in the Pearson Declaration and is summarized below; excerpts of the legislative provisions referenced in the Pearson Declaration are set forth in Exhibit D to the Pearson Declaration.

- 9 -

### A. Cayman Islands

21.     The Cayman Debtors are currently subject to official liquidation. The primary source of law governing such proceedings is Part V of the Companies Law, sections 89 through 155.

22.     A company incorporated under the laws of the Cayman Islands may be placed into voluntary liquidation by way of resolution of its shareholder(s).[3] That is what has occurred with respect to each of the Cayman Debtors. In certain circumstances, a voluntary liquidation may, by order of the Grand Court of the Cayman Islands (the "**Cayman Court**"), be brought under the direct supervision of the Cayman Court whereupon it proceeds as an "official liquidation." One circumstance where this may occur is where the directors of the company do not submit declarations of solvency in respect of the company. *See* Companies Law § 124. That is what has occurred with respect to each of the Cayman Debtors. When a supervision order is made, it takes effect for all purposes as though it was an order that the company be wound up by the Cayman Court. *See id.* § 133.

23.     On 5 October 2018, Messrs. Chilton and Pearson, in their capacity as joint voluntary liquidators of the Cayman Debtors filed petitions applying to bring the liquidation of the Cayman Debtors under the supervision of the Cayman Court. Those petitions were heard on 2 November 2018 and the Honourable Justice McMillan, a Judge of the Cayman Court, entered orders in respect of each Company to the effect that the liquidations be continued under the supervision of the Cayman Court, and that Messrs. Chilton and Pearson be appointed as JOLs, which orders were filed on 6 November 2018 and are exhibited hereto at Exhibit A-1 to the Pearson Declaration.

---

[3] Sometimes liquidation of a Cayman Islands company (whether or not ordered or supervised by the Court) is referred to as "winding up" the company.

24.     When making a supervision order, the Cayman Court will appoint official liquidators to the company.  Official liquidators are statutorily directed to take control of the company[4] and are responsible for winding up the company's affairs, subject to the supervision of the Cayman Court.   Any relevant stakeholder may attend the hearing of the winding up petition (which hearing is held in open court) and may seek to challenge the appointment of the nominated liquidators.

25.     Official liquidation is a "terminal" process, in the sense that it is designed finally to wind up the company's affairs under the stewardship of the independent official liquidators, and then to bring the existence of the company to an end.  To achieve that result, Section 110 of the Companies Law provides, in relevant part, certain duties and powers on liquidators, including:

- Identifying, safeguarding, collecting, and realising the company's assets (which may also include pursuing litigation for the benefit of the estate, which depending on the nature of the claim sometimes will take the form of a claim by the company and sometimes will be a claim by the JOLs themselves);

- Identifying the company's creditors, and resolving (usually through legal proceedings before the Grand Court) any disputes as to the existence or quantum of creditor claims;

- Distributing the assets to the company's creditors (and to the extent of any surplus, to its members), in accordance with their rights;

- Meeting various reporting requirements, both to the stakeholders, and to the Cayman Court.

- Once the above steps are complete such that the affairs of the company are fully wound up, obtaining an order from the Grand Court that the company be dissolved.  There is no prescribed timeframe in which an official liquidation must be completed.

---

[4] In this case, the official liquidators were already voluntary liquidators of the Companies, and so the Companies had already been under their control in that capacity.  As Companies Law § 133(a) and (b) confirm, where a supervision order is made, the voluntary liquidation is still taken to have commenced at the time of passing the necessary resolution, and the prior actions of the voluntary liquidators are valid and binding upon the company and its official liquidators.

26.     An official liquidation is judicial in nature, in the sense that (a) it is initiated by an order of the Cayman Court; (b) throughout the liquidation process the official liquidators report to and are supervised by the Cayman Court; and (c) the liquidation is brought to a close and the company dissolved by an order of the Cayman Court.

27.     Once appointed, the official liquidators take full control of the company and its assets (again, subject to the supervision of the Cayman Court).  *See* CWR O.18 r.1(2).  The powers of the directors, who previously controlled the company, are suspended by the appointment of liquidators.

28.     Liquidators are also obligated, when appropriate, to review, assess, and when necessary, object to or compromise claims of creditors against the company in liquidation.  This is a process whereby putative creditors put forward their claims in a prescribed form, setting out the basis, particulars and evidence in support of their claims.  The Liquidators are required to adjudicate those proofs of debt in a "quasi-judicial" (that is, even handed and impartial) fashion.  *See* CWR O.16 r.1(4).  If the Liquidators reject (or admit only in part) a proof of debt, a dissatisfied creditor may appeal that rejection to the Cayman Court, which will conduct a *de novo* of the adjudication of that creditors' proof of debt.  *See* CWR O.16 rr.17 – 18.  Similarly, if a stakeholder is dissatisfied with the liquidators' decision to admit a proof of debt of another creditor, they may apply to the Grand Court to have that proof of debt expunged. *See* CWR O.16 r.20 – 21.

29.     Official liquidators are officers of the Cayman Court and are subject to the supervision of the Cayman Court.  *See* CWR O.18 r.1(1); Companies Law § 110(3).  This supervision permits any stakeholder, if dissatisfied with any action (or inaction) on the part of the liquidator, to seek an order of the Cayman Court directing the liquidator to exercise or refrain

from exercising any powers in a particular way. *See* CWR O.11 r.1(2). Liquidators must also prepare reports and accounts with respect to their conduct of the liquidation and the state of the company's affairs, and to deliver those to the Cayman Court. *See* CWR O.10 r.1(1), r.1(2)(e), O.10 r.2, O.10 r.2; Companies Law § 114(1). The Cayman Court must approve the official liquidators' remuneration. Ultimately, though rarely, the Cayman Court may also remove official liquidators, upon the application of a stakeholder. *See* Companies Law § 107.

### B. British Virgin Islands

30.     The primary sources of law governing the liquidation proceedings of each of the BVI Debtors are the Business Companies Act, 2004 and the Insolvency Act, 2003. In the case of the BVI Debtors, Messrs. Briscoe and Pearson were appointed Liquidators pursuant to Written Resolution of the Sole Shareholder for each of the BVI Debtors pursuant to Section 88 of the Business Companies Act. Such written resolutions are valid and permit a member of a company to appoint eligible insolvency practitioners pursuant to Section 159(2) of the Insolvency Act. Both Messrs. Briscoe and Pearson are eligible insolvency practitioners in the British Virgin Islands.

31.     Immediately upon the BVI Debtors being placed into liquidation, the Liquidators were vested with custody and control of the BVI Debtors' assets. *See* Insolvency Act § 175(1)(a). And, while the directors of the BVI Debtors remain in office, they cease to have any power, function or duties. *Id.* § 175(1)(b). And, unless the High Court of the British Virgin Islands (the "**BVI Court**") orders otherwise, no person may commence or proceed with any

- 13 -

action or proceeding against the BVI Debtors or their assets, nor may any person exercise or
enforce any right or remedy of their assets. *Id.* § 175(1)(c).[5]

32.     A liquidator, in all circumstances, acts as an officer of the BVI Court and an agent
of the company in liquidation. *Id.* § 184. The duties of a liquidator are to take possession of,
protect, and realise all assets of the company in liquidation and to distribute those assets in
accordance with the priorities set forth in the Insolvency Act. *Id.* § 185. A liquidator is granted
all powers necessary to carry out the functions and duties of a liquidator under the Insolvency
Act. *Id.* § 186. These powers include, without limitation, the power to bring claims on behalf of
and defend claims against the company in liquidation, dispose of the company's property,
compromise and settle claims of creditors, and pay creditors from the assets of the company. *See*
Insolvency Act, Schedule 2. The Liquidators, while officers of the BVI Court, may also apply to
the BVI Court at any time for directions in connection with the conduct of the liquidation. *See*
Insolvency Act § 186(5). The BVI Court also retains the power to remove the Liquidators for
certain enumerated causes. *Id.* § 187.

33.     As with insolvency proceedings in the Cayman Islands, the Liquidators have a
duty to investigate the assets and affairs of the company in liquidation and issue report to
creditors and contributories (*i.e.*, shareholders) of the company in liquidation and otherwise has
an obligation to call meetings of creditors in certain circumstances. *See, e.g., id.* §§ 226, 228.
And, the creditors may also establish a creditors committee at any time after the appointment of
liquidators to represent their interests. *Id.* § 421(1)(c).

34.     The Liquidators may also require creditors to submit claims and may with
adjudicating those claims. *Id.* § 209. The Liquidators, as officers of the BVI Court, act in a

_____

[5] A secured creditor, however, may take possession of and realise or otherwise deal with assets of the
company in liquidation over which such creditor has a security interest. *Id.* § 175(2).

quasi-judicial capacity in this process. When the Liquidators reject a claim in whole or in part, they must provide the creditor with the reasons for such rejection. *Id.* § 209(4).

35. Once the Liquidators have liquidated the assets of the company in liquidation and adjudicated the claims against the company, the Liquidators are obligated to distribute all assets of the company to creditors and contributories in accordance with the applicable priorities under the Insolvency Act. *Id.* § 207. Upon the completion of the Liquidators' duties, they must issue a final report to creditors and contributories, seek to have the company in liquidation struck from the Register of Companies and otherwise dissolve the company in liquidation. *Id.* § 234.

### C. Bermuda

36. Biscayne Capital Holdings Limited, a Debtor herein, is subject to a "creditors' voluntary liquidation" in Bermuda. The primary sources of Bermuda law that define the scope of a creditor voluntary liquidation proceeding are Sections 216 to 233 of the Companies Act, to which the Bermuda Debtor is subject. Messrs. Briscoe and Pearson's appointment as Liquidators of the Bermuda Debtor was effectuated pursuant to Section 216 of the Companies Act, which required the directors of the Bermuda Debtor to call a meeting of the creditors of the Bermuda Debtor through advertisement in an "appointed newspaper" on at least two occasions. At the creditors meeting, a director of the company must cause a full statement of the position of the company's affairs together with a list of creditors and an estimated amount of their claims to be set forth for the creditors. *See id.* § 216(3)(a). At the creditors meeting, the creditors and the company may each nominate a liquidator. *Id.* § 217(a). Messrs. Briscoe and Pearson were the nominated Liquidators appointed at the creditors meeting of the Bermuda Debtor. The Liquidators are statutorily directed to wind up the affairs of the company in liquidation and

distribute those assets in accordance with the statutory priorities of creditors and investors.  *See id.*

37.     In a creditor voluntary liquidation, the creditors may, if they deem it appropriate, appoint a "committee of inspection" of not more than five creditors.  The committee of inspection is granted statutory rights, certain of which are described below, that generally permit creditors an opportunity to ensure that their interests are being properly represented by the liquidators.  *See id.* § 218.

38.     Liquidators are granted specific powers to effectuate these duties.  These powers include the power to bring and defend actions by or against the company, to carry on the business of the company for purposes of winding up the company, pay creditors with the assets of the company, and otherwise compromise and settle the claims of creditors and investors against the company.  *See id.* §§ 226(1)(a), (b); 175(1)(a), (b), (d), (e).[6]  When a company is insolvent, the Liquidators are statutorily directed to distribute the company's assets *pari passu* amongst its creditors.  *Id.* § 225.  The Liquidators may also propose an arrangement for the compromise of debts that may, subject to rights of appeal, be binding upon the creditors of the company if three quarters of creditors (both by number and value) consent to the arrangement.  *Id.* § 229.

39.     At various points, the Liquidators are subject to Court oversight.  As noted above, certain powers may only be exercised by sanction of the Court (or approval of the committee of inspection).  Additionally, the Court exercises broad oversight through the power to remove liquidators for cause.  *Id.* § 227(2).  Furthermore, the Liquidators, as well as creditors and

---

[6] The power to pay creditors and compromise the claims of creditors may only be exercised with the sanction of the Court or the consent of the committee of inspection.

contributories (*i.e.*, shareholders) are granted the power to petition the Court to determine any issue that may arise in the course of the liquidation.  *Id.* § 231(1).

D.  *Basis and Determination to Seek Chapter 15*

40.     The Liquidators have determined to submit each of the Petitions and related papers to have each of the Proceedings recognized by this Court as a "foreign main proceeding" and to recognize Messrs. Chilton and Pearson as "foreign representatives" of the Cayman Debtors and Messrs. Briscoe and Pearson as "foreign representatives" of the BVI Debtors and the Bermuda Debtor, in accordance with section 101(24) of the Bankruptcy Code.

41.     The need for recognition under chapter 15 of the Bankruptcy Code is clear. Based upon the investigation to date, it is clear that the Debtors were under common control and controlled for the common benefit of the Principals.  The Debtors collectively raised a significant amount of money from third party creditors, which was intended to be deployed for the purpose of real estate and related investments, both inside and outside the United States.  However, much of the money that was raised has been dissipated and, currently, the creditors of each of the Debtors stand to suffer a near total loss of their invested capital.

42.     The Liquidators have been attempting to obtain the books and records of the Debtors.  While certain parties in possession of those books and records have cooperated, many have not, including many parties located in the United States.  It is likely that, to collect the Debtors' books and records, it will be necessary for the Liquidators to issue subpoenas and other legal process.

43.     Ultimately, it is likely that the Liquidators may conclude through their investigation that the Debtors have viable claims against third parties for recovery of damages. Recognition of the Proceedings through this chapter 15 proceeding will provide the Liquidators

- 17 -

with a venue through which they may ultimately be able to bring such claims. Equally importantly, given that the Proceedings and the investigations are in their infancy, recognition of the Proceedings will toll many of the claims the Liquidators may be able to bring that touch and concern the United States for two years under 11 U.S.C. § 108. This tolling will afford the Liquidators an opportunity to conclude their investigations and properly and timely assert claims against third parties who may have engaged in wrongful conduct.

44.     It is appropriate to recognize each of the Proceedings as a "foreign main proceeding." Each Debtor's center of main interests ("*COMI*") is located in the jurisdiction in which its liquidation Proceeding is pending. Each Debtor is organized under the laws of the jurisdiction in which its liquidation Proceeding is pending. Similarly, the registered office for each of the Debtors is located in the jurisdiction in which its Proceeding is pending. Specifically, the registered office for each of the Debtors is as follows:

*Cayman Islands Debtors:* formerly c/o AFA Legal Resources (Cayman) Ltd., Artemis House, Second Floor, 67 Fort Street, George Town, Grand Cayman KY1-1109, Cayman Islands and now c/o FFP Limited, Harbour Centre, 42 North Church St, George Town, Grand Cayman, KY1-9006, Cayman Islands;

*Biscayne Capital Holdings Limited:* c/o BCB Charter Corporate Services Limited, Trinity Hall, 43 Cedar Avenue, Hamilton HM12, Bermuda;

*Vanguardia Holdings Ltd. (in Liquidation), North Pointe Holdings (BVI) Ltd. (in Liquidation) and Biscayne Capital (B.V.I.) Ltd.:* formerly c/o Amicorp B.V.I. Limited, Marcy Building I 2nd Floor, Purcell Estate I P.O. Box 2416, Road Town I Tortola, British Virgin Islands and now c/o FFP (BVI) at 2nd Floor TICO Building, Wickhams Cay II, P.O. Box 4441, Road Town, Tortola, British Virgin Islands, VG 1110; and

*Spyglass Investment Management Ltd. (in Liquidation):* formerly c/o Mossack, Fonseca & Co (B.V.I.) Ltd., Akara Building, 24 De Castro Street, Wickhams Cay I, Road Town Tortola and now c/o FFP (BVI) at 2nd Floor TICO Building, Wickhams Cay II, P.O. Box 4441, Road Town, Tortola, British Virgin Islands, VG 1110.

45.     The "organic" law for each of the Debtors – specifically the law that will govern their winding-up, dissolution, resolution of claims, and distribution of assets, as described in

detail above – is the law governing each of the Proceedings, which in turn is the law of incorporation for each of the Debtors.

46.     Similarly, as set forth in detail above, the liquidations of each of the Debtors is, to varying degrees, overseen by the Cayman Court, the BVI Court, and the Bermuda Court, respectively.  Those Courts have the jurisdiction to oversee and determine issues of primary importance in the Proceedings, including, without limitation, the identity and oversight of the Liquidators, the realization and distribution of assets of the Debtors, and any disputed issues that may arise in the course of the Proceedings.

47.     Additionally, specifically with respect to the Cayman and BVI Debtors, the Liquidators are physically situated in the Cayman Islands and the British Virgin Islands and have been since and prior to their appointment.  Thus, the operative decision making for the Debtors has emanated from both the Cayman Islands and the British Virgin Islands.[7]  And, with respect to all of the Debtors, while the creditors and investors appear to be global in scope, the center of the collection and distribution of the Debtors' assets and resolution of claims against the Debtors will be focused in the jurisdictions in which the Proceedings are pending.

48.     Finally, as set forth further below, recognizing each of the Proceedings as a foreign main proceeding is consistent with the purposes of chapter 15 of the Bankruptcy Code and the public policy of the United States.

---

[7] While the physical location of the Liquidators is a factor that the Court may rely upon in determining COMI, it is not the exclusive factor, nor – in the case of the Bermuda Debtor – should it be the dispositive factor. There is a very strong interest in having each of the liquidations overseen by a common set of Liquidators, based upon the facts presented by these Debtors as set forth in the Pearson Declaration.  And, even though FFP does not formally have an office in Bermuda, Messrs. Briscoe and Pearson remain in all respects subject to the laws of Bermuda in the conduct of the liquidation of the Bermuda Debtor and, ultimately, subject to the oversight of the Bermuda Court.

## III.  RELIEF REQUESTED

49.    The Petitioners respectfully request an order, substantially in the form attached

hereto as Exhibit A:

(a)    recognizing each of the Foreign Proceedings, under section 1517 of the Bankruptcy Code, as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code;

(b)    granting relief automatically and as of right upon recognition of the Foreign Proceedings as a foreign main proceeding under section 1520(a) of the Bankruptcy Code;

(c)    granting certain additional relief pursuant to section 1521(a) of the Bankruptcy Code, including an injunction prohibiting all persons and entities, other than the Petitioners and their representatives, attorneys, and agents, from: (i) commencing or continuing an action or proceeding concerning any of the Debtors' assets, rights, obligations, or liabilities; (ii) executing against any of the Debtors' assets; (iii) taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff, or other claim against the Debtors or their property; (iv) transferring, relinquishing, or disposing of any property of the Debtors to any person or entity other than the Petitioners; or (v) declaring or considering the commencement of the Foreign Proceeding or the Debtors' chapter 15 case a default under any agreement, contract, or arrangement;

(d)    in accordance with section 1521(4), providing for the examination of witnesses (including any and all parties or persons subject to examination under F.R.B.P. 2004), the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations, or liabilities;

(e)    in accordance with sections 1521(a)(5) and (b) of the Bankruptcy Code, entrusting the administration, realization, and distribution of the Debtors' assets located in the territorial jurisdiction of the United States to the Petitioners; and

(f)    awarding the Petitioners such other relief as this Court may deem just and proper.

## IV.  BASIS FOR RELIEF REQUESTED

### A.    All Requirements for Recognition Under Section 1517(a) Are Satisfied.

50.    Section 1517 of the Bankruptcy Code lays out a two-step process for granting

recognition to a foreign proceeding:

- *First*, section 1517(a) of the Bankruptcy Code provides that "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).

- *Second*, section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests [("*COMI*")]." 11 U.S.C. § 1517(b)(1).

All requirements for recognition of the Foreign Proceedings as foreign main proceedings are satisfied here. 11 U.S.C. § 1502(4).

### i.  The Foreign Proceedings Are Foreign Main Proceedings.

#### a.  Each Proceeding is a "Foreign Proceedings" within the meaning of Section 101(23) of the Bankruptcy Code.

51.  Section 101(23) of the Bankruptcy Code defines "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). Courts have identified seven criteria to establish that a "foreign proceeding" under section 101(23), which are: (i) the existence of a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign county; (v) that is authorized or conducted under a law related to insolvency or adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation. *See, e.g., In*

*re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009).  Neither criterion (i) nor (iv) – the existence of a proceeding in a foreign country – are in any dispute here.  As set forth below, the Proceedings satisfy each of the other criteria to establish each of the Proceedings as a "foreign proceeding."

52.     Criterion (ii) and (vi) are overlapping and together require that the proceeding be "either judicial or administrative" and that the debtor's "assets and affairs be subject to the control or supervision of a foreign court."  Courts recognize that this is "not a demanding standard."  *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 138 (S.D.N.Y. 2012).  It does not require day-to-day control by the foreign court.  When a court, for instance, monitors a repayment plan between a debtor and its creditors, that is sufficient.  *See In re Oversight and Control Commission of Avanzit, S.A.*, 385 B.R. 525, 536 (Bankr. S.D.N.Y. 2008).  Similarly, just because interested parties may initiate a proceeding and independent liquidators may be appointed and proceed with their duties without substantial court involvement does not "undermine the court's supervisory role." *In re ABC Learning Centres, Ltd.*, 445 B.R. 318, 332 (Bankr. D. Del. 2010).

53.     Each of the Proceedings satisfies criteria (ii) and (vi).  As set forth in the Pearson Declaration, each of the Proceedings is subject to the oversight, respectively, of the Cayman Court, BVI Court, and Bermuda Court.  The Cayman Court has entered a specific supervisory order related to the Cayman Debtors, which requires the Liquidators to report to the Cayman Court periodically and to obtain an order of the Cayman Court in connection with the dissolution of the Cayman Debtors.  *See* Pearson Declaration ¶ 22-23; 25; Exhibit A-1.  Similarly, the Cayman Court will review *de novo* the Liquidators' determination of proofs of debt.  *Id.* ¶ 27. Similarly, the Cayman Court retains an ultimate authority to compel the Liquidators to act or

refrain from acting, approves the Liquidators remuneration, and otherwise may remove the Liquidators from their office in appropriate circumstances. *Id.* ¶ 28.

54.     With respect to the BVI Debtors, the Liquidators specifically act as officers of the BVI Court in the conduct of their duties. *Id.* ¶ 31.  In such a capacity, the Liquidators are directed to liquidate the assets of the company in liquidation and may apply to the BVI Court for direction in the course of the liquidation. *Id.*  Similarly, in appropriate circumstances, the BVI Court may remove the Liquidators from their office for certain enumerated causes. *Id.*

55.     With respect to the Bermuda Debtor, the Bermuda Court may determine any issue brought to it by the Liquidators, creditors, or contributories in the course of the liquidation. *Id.* ¶ 38.  The Bermuda Court may also remove the Liquidators and the Bermuda Court has the power to authorize the payment of creditors from the assets of the company in liquidation. *Id.*

56.     For each of the foregoing reasons, each of the Proceedings is "judicial or administrative" and assets and affairs are subject to the "control or supervision" of the Cayman Court, BVI Court, and Bermuda Court respectively.   Therefore, both criteria (ii) and (vi) are satisfied.

57.     Criterion (iii) is also satisfied – each of the Proceedings is also a "collective proceeding." A "collective" proceeding is one where the benefits of the proceeding are shared collectively among the Debtors' creditors, rather than one that is intended to benefit only a single creditor. *See, e.g., Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136–37 (S.D.N.Y. 2012).  Attributes of a "collective" proceeding include proceedings where similarly situated creditors are treated in a similar fashion, where assets are distributed according to statutory priorities, and where creditors have a mechanism to seek court review of decisions made in the course of the proceeding.

- 23 -

58.     Each of the Proceedings is a collective proceeding.  With respect to the Cayman
Debtors, all stakeholders were provided notice of the winding up petition.  *See* Pearson
Declaration ¶ 23.   Stakeholders may also petition the Cayman Court for a review of any
decisions made in the course of the Proceedings.  *Id.* ¶ 28.  And the rights of creditors and other
stakeholders of the Cayman Debtors to receive distributions is prescribed by statute.  *Id.* ¶ 24.

59.     Similarly, with respect to the BVI Debtors, the distribution of assets is subject to
prescribed statutory priorities.  *Id.* ¶ 31.  Assets are collected for the benefit of all creditors.  *Id.*
The Liquidators are charged with the review of and determination of each claim against the BVI
Debtors.  *Id.* ¶ 33.  They are also required to issue reports to all creditors and call meetings of all
creditors.  *Id.* ¶ 34.  And the BVI Court may review and decide issues that arise in the course of
the liquidations.  *Id.* ¶ 31.

60.     With respect to the Bermuda Debtor, all creditors were provided notice of the
creditors meeting and were provided an opportunity to participate in the Liquidators
appointment.  *Id.* ¶ 35.  This meeting was conducted where all creditors had the identity of all of
the other creditors and an estimate of the amount that they were owed.  *Id.* ¶ 35.  Creditors are
also entitled to form a committee of inspection.  *Id.* ¶ 36.  And creditors are paid pursuant to a
specified statutory scheme of priorities.  *Id.* ¶ 37.  The Bermuda Court is ultimately has the
power to decide any issues that may arise in the course of the Proceeding.  *Id.* ¶ 38.  Thus each of
the Proceedings is a "collective" proceeding for purposes of section 101(23) of the Bankruptcy
Code.

61.     Finally, both criteria (v) and (vii) are satisfied.  Each of the Proceedings is
authorized or conducted under a law related to insolvency or adjustment of debts and is for the
purpose of reorganization or liquidation.  As set forth in the Pearson Declaration, the focus of

each Proceeding is to collect in the assets of each of the Debtors (including through the investigation and pursuit of third party claims), examine and, if necessary, adjust the claims of various creditors, pay out creditors in accordance with their statutory priorities, and then terminate, liquidate, and dissolve each of the Debtors. *See generally* Pearson Declaration ¶¶ 20-38. Thus both criteria (v) and (vii) are satisfied. And, because each of the Proceedings satisfy each of the seven criteria, each Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

b.    Each Proceeding is a Foreign "Main" Proceeding.

62.    Each Proceeding is a "foreign main proceeding." Section 1502(4) of the Bankruptcy Code defines a foreign main proceeding as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). As further set forth below, each Debtor's COMI is located in the jurisdiction where each Proceeding is pending.

63.    Section 1516(c) of the Bankruptcy Code provides that, "absen[t] evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). Because the COMI is undefined in the Bankruptcy Code, this presumption comports with judicial precedent that "generally equates [the COMI] with the concept of 'principal place of business' in the United States." *In re Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011) (quoting *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 634 (E.D. Cal. 2006)); *see also In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008) (using "COMI" and "principal place of business" interchangeably). Thus, in determining the COMI, courts have considered "any relevant activities, including liquidation activities and administrative functions . . . the

- 25 -

location of the debtor's headquarters; the location of those who actually manage the debtor . . . the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and[] the jurisdiction whose law would apply to most disputes." *See In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 416 (citing *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013)). COMI should be assessed as of the date of the filing of the chapter 15 proceeding. *See, e.g., In re British American Ins. Co., Ltd.*, 425 B.R. 884 (Bankr. S.D. Fla. 2010).

64. Here, since the Debtors have their registered offices in the locations where the underlying Proceedings are pending, the Cayman Islands, British Virgin Islands, and Bermuda are their presumed COMI. 11 U.S.C. § 1516(c). This presumption is supported by the underlying facts. As set forth in detail in the Pearson Declaration, the Liquidators are obligated to collect and liquidate all of the Debtors' assets, wherever located, and bring them, respectively, to the Cayman Islands, British Virgin Islands, and Bermuda for distribution through a Court-approved and statute sanctioned distribution priority. Any disputes over the application of those statutes will be referred to and decided by each applicable Court. Furthermore, since the appointment of the Liquidators, they have taken active steps to assess each Debtor's assets, collect in the books and records of each of the Debtors, and otherwise focus on their statutory duties to liquidate each of the Debtors. Therefore, each of the Proceedings is and should be recognized as a foreign main proceeding.

**ii.    The Petitioners are Qualifying Foreign Representatives.**

65. Section 101(24) of the Bankruptcy Code defines "foreign representative" as "a person . . . authorized in a foreign proceeding to administer the reorganization or the

- 26 -

liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). The Petitioners satisfy this definition. First, the Petitioners are individuals and thus "persons" under section 101(41) of the Bankruptcy Code. Second, in accordance with the Appointment Orders, the Petitioners are authorized to administer the liquidations of each of the Debtors' assets in accord with the terms of the Appointment Orders. *See* Pearson Declaration, Exhibit A.

### iii.    The Petition Meets the Requirements of Section 1515.

66.    Finally, the Proceedings satisfies the procedural and evidentiary requirements of section 1515 of the Bankruptcy Code that are necessary for recognition as a foreign main proceeding. Under Section 1515, a petition must be filed with the court and accompanied by certain statements and documents. *See* 11 U.S.C. § 1515. The Petitions here, as supported by the Pearson Declaration, meets these requirements.

67.    *First*, the Petitioners properly filed the Petitions on behalf of the Debtors in accordance with section 1515(a) of the Bankruptcy Code.

68.    *Second*, as required under section 1515(b) of the Bankruptcy Code, documents evidencing each Proceeding's existence and the Petitioners' appointment are attached as Exhibit A to the Pearson Declaration.

69.    *Third*, the Pearson Declaration includes a statement that each of the Proceedings is the only foreign proceeding with respect to each of the Debtors known to the Petitioners, thereby satisfying Section 1515(c)'s requirement to list all known foreign proceedings pending with respect to a debtor.

70.    *Fourth*, the Pearson Declaration includes all information required by Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure, including a corporate ownership

- 27 -

statement, a list of all persons authorized to administer each Debtor's assets, a list of all parties to

litigation pending in the U.S. in which each Debtor is a party, and a list of all entities, if any,

against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

**B.    The Petitioners' Request Necessary and Appropriate Relief under Section 1521(a).**

71.    Pursuant to section 1521(a) of the Bankruptcy Code, the Petitioners request that

this Court enter an order granting certain additional relief as described above.  The Court has

authority, upon recognizing each Proceeding, to grant "any appropriate relief" under section

1521(a) of the Bankruptcy Code when necessary to effectuate chapter 15's purpose and protect

the Debtors' assets or the interests of its creditors and other stakeholders.  The additional relief

requested in each Petition is "appropriate" because it is necessary to (i) identify and pursue the

Debtors' assets in the U.S. (including potential claims), (ii) protect the Debtors' assets from

pending or future litigation, and (iii) generally ensure each Proceeding's success.

72.    Under section 1522(a) of the Bankruptcy Code, this Court may only grant

additional relief under section 1521(a) of the Bankruptcy Code if creditors' interests are

"sufficiently protected."  In making this determination, courts balance the interests of the foreign

representatives with the interests of creditors and other affected parties.  *CT Inv. Mgmt. Co.*

*v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A. de C.V.)*, 482 B.R. 96, 108 (Bankr.

S.D.N.Y. 2012); *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013).  And in

considering creditors' interests, the limitation in Section 1522(a) only applies where "it is shown

that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  *See*

H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).

73.    The circumstances here demonstrate that creditors' interests are "sufficiently

protected."    Each Proceeding affords creditors proper treatment because each Debtor's

liquidation will treat each creditor in accordance with the priorities set forth in each of the Proceedings. Next, U.S. creditors will not be subject to undue prejudice. And the distribution of each Debtor's assets is similar to what might occur under U.S. law. Finally, even if creditors could prove harm to their interests, the need to ensure the efficiency and success of the Proceeding outweighs that harm.

WHEREFORE, the Petitioners respectfully request an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as this Court deems just and proper.

Dated: November 27, 2018
Miami, Florida

EFR LAW FIRM

/s/ Eduardo F. Rodriguez
Eduardo F. Rodriguez (Florida Bar No. 36423)
1548 Brickell Avenue
Miami, Florida 33129
(305) 340-0034 (telephone)

ALSTON & BIRD LLP

William S. Sugden (*pro hac vice pending*)
Jonathan T. Edwards (*pro hac vice pending*)
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000 (telephone)

*Attorneys for the Foreign Representatives*

# EXHIBIT A

**[Proposed Order]**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 15 |
| North Pointe Holdings (BVI) Ltd. (in ) | |
| Liquidation), ) | Case No. 18-24659-AJC |
| ) | |
| Debtor in a Foreign Proceeding. ) | |

**ORDER RECOGNIZING FOREIGN MAIN PROCEEDING**
**AND GRANTING ADDITIONAL RELIEF**

This Court held a hearing on _____, to consider the official form and

verified petitions, filed on November 27, 2018 (together, the "*Petitions*") by Michael Pearson

of FFP Limited and Hadley Chilton of FFP (BVI) Limited, in their capacities as Joint Official

Liquidators (the "*Cayman Islands Petitioners*") of Diversified Real Estate Development Ltd (in

Official Liquidation); GMS Global Market Step Up Note Ltd (in Official Liquidation);

Preferred Income Collateralized Interest Ltd (in Official Liquidation); Sentinel Investment Fund

SPC (in Official Liquidation); SG Strategic Income Ltd (in Official Liquidation); Sports

Aficionados Ltd (in Official Liquidation); and Vanguardia Group Inc (in Official Liquidation)

(the "*Cayman Islands Debtors*"), Michael Pearson of FFP Limited and Stephen Briscoe of FFP

(BVI) Limited, in their capacities as Joint Liquidators (the "*British Virgin Islands Petitioners*")

for Vanguardia Holdings Ltd. (in Liquidation), Spyglass Investment Management Ltd. (in

Liquidation), North Pointe Holdings (BVI) Ltd. (in Liquidation), and Biscayne Capital (B.V.I.)

Ltd. (in Liquidation) (the "*British Virgin Islands Debtors*"), and Michael Pearson of FFP

Limited and Stephen Briscoe of FFP (BVI) Limited, in their capacity as Liquidators (the

"*Bermuda Petitioners*" and together with the Cayman Islands Petitioners and British Virgin

Islands Petitioners, the "*Petitioners*" or the "*Foreign Representative*") of Biscayne Capital

Holdings Limited (in Creditor Voluntary Liquidation) (the "***Bermuda Debtor***" and together with the Cayman Islands Debtors and the British Virgin Islands Debtors, the "***Debtors***").   The Foreign Representatives seek an order from the Court recognizing the winding up and liquidation of each of the Debtors (each a "***Proceeding***" collectively the "***Proceedings***") as a foreign main proceeding under section 1517 of title 11 of the United States Code (the "***Bankruptcy Code***") and granting certain additional relief under section 1521 of the Bankruptcy Code.  After due deliberation and sufficient cause appearing therefor, this Court makes the following findings of fact and conclusions of law:

A.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408, 1409 and 1410.

B.     The Petitioners are "persons," as such term is defined in 11 U.S.C. § 101(41).

C.     The Debtors are eligible to be a debtor under 11 U.S.C. § 109(a).

D.     The Petitioners are the Debtors' "foreign representative," as such term is defined in 11 U.S.C. § 101(24).

E.     This chapter 15 cases were properly commenced under 11 U.S.C. §§ 1504 and 1515.

F.     The Petitioners have satisfied the requirements of 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007(a)(4).

G.     The Proceedings are a "foreign proceeding," as such term is defined in 11 U.S.C. § 101(23).

H.     The Proceedings are entitled to recognition by this Court under 11 U.S.C. § 1517(a).

2

I.      The Proceedings are pending in the country where each of the Debtors' have their center of main interests and are a "foreign main proceeding," as such term is defined in 11 U.S.C. § 1502(4), and are entitled to recognition as a "foreign main proceeding" under 11 U.S.C. § 1517(b)(1).

J.      The Petitioners are entitled to all the relief provided pursuant to 11 U.S.C. § 1520, without limitation.

K.      The Petitioners are entitled to all relief expressly set forth in 11 U.S.C. §§ 1521(a)–(b).

L.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted under 11 U.S.C. §§ 1517, 1520, and 1521.

Accordingly, it is hereby **ORDERED**:

1.      The Proceedings are granted recognition as a foreign main proceedings under 11 U.S.C. §§ 1517(a) and 1517(b)(l).

2.      All relief afforded a foreign main proceeding under 11 U.S.C. § 1520 is granted.

3.      In accordance with 11 U.S.C. § 1520(a)(1), 11 U.S.C. §§ 361 and 362 apply to the Debtors and their property that is currently within or may be brought into the territorial jurisdiction of the United States.

4.      The Petitioners are authorized to file notices of these cases, the applicability of 11 U.S.C. §§ 361 and 362, and any other such notices the Petitioners deem necessary in any of the pending litigation wherein a Debtor is a party or any other proceeding.

5.     The Petitioners are authorized to operate the Debtors' business and exercise the powers of a trustee to the extent provided by 11 U.S.C. § 1520(a)(3), including, for the avoidance of doubt, drawing down on the Debtors' United States bank, securities, deposit, and similar accounts and making distributions in the Proceedings.

6.     In accordance with 11 U.S.C. § 1521(a), all persons and entities, other than the Petitioners and their representatives and agents, are hereby enjoined from (a) commencing or continuing an action or proceeding concerning the Debtors' assets, rights, obligations, or liabilities; (b) executing against any of the Debtors' assets; (c) taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff, or other claim against the Debtors or their property; (d) transferring, relinquishing, or disposing of any property of the Debtors to any person or entity other than the Petitioners; or (e) declaring or considering the commencement of the Proceedings or the Debtors' chapter 15 case a default under any agreement, contract, or arrangement.

7.     In accordance with section 1521(4) and the Federal Rules of Bankruptcy Procedure (the "*F.R.B.P.*"), the Petitioners are authorized to conduct the examination of witnesses (including any and all parties or person subject to examination under F.R.B.P. 2004), the taking of evidence, or the delivery of information concerning the Debtors' assets, affairs, rights, obligations, or liabilities.

8.     In accordance with 11 U.S.C. §§ 1521(a)(5) and (b), the administration, realization, and distribution of the Debtors' assets located within the territorial jurisdiction of the United States are entrusted to the Petitioners, and the Petitioners are hereby established as the exclusive representatives of the Debtors in the United States.

9.      No action taken by the Petitioners, the Debtors, or their representatives in connection with these chapter 15 cases or any adversary proceeding filed by or against the them shall be deemed to constitute a waiver of the rights or benefits afforded such persons under 11 U.S.C. §§ 306 and 1510.

10.     A copy of this order shall be served, within five business days of entry of this order, by fax, e-mail, regular mail, or overnight courier upon all of the Debtors' known creditors and investors, the Office of the United States Trustee, and such other entities as the Court may direct.  Service in accordance with this Order shall constitute adequate and sufficient notice of the terms hereof.

11.     This Court shall retain jurisdiction with respect to the enforcement or interpretation of this Order and any request by any person or entity for relief from the provisions hereof.

### 

Submitted by:

William S. Sugden
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
(404) 881-7000 (telephone)
Will.Sugden@alston.com

*Counsel to the Foreign Representatives*

EXHIBIT B



**ORDERED in the Southern District of Florida on January 11, 2019.**

_A. Jay Cristol, Judge_
**United States Bankruptcy Court**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 15 |
| NORTH POINTE HOLDINGS (BVI) | ) | |
| LTD. (in Liquidation), _et al.,_ | ) | Case No. 18-24659-AJC |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | Jointly Administered |
| | ) | |

**ORDER RECOGNIZING FOREIGN MAIN PROCEEDING**
**AND GRANTING ADDITIONAL RELIEF**

This Court held a hearing on January 10, 2010 at 2 p.m., to consider the official

forms and verified petitions, filed on November 27, 2018 (together, the "**_Petitions_**") [Doc.

No. 3] by Michael Pearson of FFP Limited and Hadley Chilton of FFP (BVI) Limited, in their

capacities as Joint Official Liquidators (the "**_Cayman Islands Petitioners_**") of Diversified Real

Estate Development Ltd. (in Official Liquidation); GMS Global Market Step Up Note Ltd. (in

Official Liquidation); Preferred Income Collateralized Interest Ltd. (in Official Liquidation);

Sentinel Investment Fund SPC (in Official Liquidation); SG Strategic Income Ltd. (in Official

Liquidation); Sports Aficionados Ltd. (in Official Liquidation); and Vanguardia Group Inc. (in

Official Liquidation) (the "*Cayman Islands Debtors*"), Michael Pearson of FFP Limited and Stephen Briscoe of FFP (BVI) Limited, in their capacities as Joint Liquidators (the "*British Virgin Islands Petitioners*") for Vanguardia Holdings Ltd. (in Liquidation); Spyglass Investment Management Ltd. (in Liquidation); North Pointe Holdings (BVI) Ltd. (in Liquidation); and Biscayne Capital (B.V.I.) Ltd. (in Liquidation) (the "*British Virgin Islands Debtors*"), and Michael Pearson of FFP Limited and Stephen Briscoe of FFP (BVI) Limited, in their capacity as Liquidators (the "*Bermuda Petitioners*" and together with the Cayman Islands Petitioners and British Virgin Islands Petitioners, the "*Petitioners*" or the "*Foreign Representative*") of Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation) (the "*Bermuda Debtor*" and together with the Cayman Islands Debtors and the British Virgin Islands Debtors, the "*Debtors*").  The Foreign Representatives seek an order from the Court recognizing the winding up and liquidation of each of the Debtors (each a "*Proceeding*" collectively the "*Proceedings*") as a foreign main proceeding under section 1517 of title 11 of the United States Code (the "*Bankruptcy Code*") and granting certain additional relief under section 1521 of the Bankruptcy Code.  After due deliberation and sufficient cause appearing therefor, this Court makes the following findings of fact and conclusions of law:

A.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408, 1409 and 1410.

B.      The Petitioners are "persons," as such term is defined in 11 U.S.C. § 101(41).

C.      The Debtors are eligible to be a debtor under 11 U.S.C. § 109(a).

D.      The Petitioners are the Debtors' "foreign representative," as such term is defined in 11 U.S.C. § 101(24).

E.      This chapter 15 cases were properly commenced under 11 U.S.C. §§ 1504 and 1515.

F.      The Petitioners have satisfied the requirements of 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007(a)(4).

G.      Each Proceeding is a "foreign proceeding," as such term is defined in 11 U.S.C. § 101(23).

H.      Each Proceeding is entitled to recognition by this Court under 11 U.S.C. § 1517(a).

I.      Each Proceeding is pending in the country where each Debtor has its center of main interests and each foreign proceeding is a "foreign main proceeding," as such term is defined in 11 U.S.C. § 1502(4), and is entitled to recognition as a "foreign main proceeding" under 11 U.S.C. § 1517(b)(1).

J.      The Petitioners are entitled to all the relief provided pursuant to 11 U.S.C. § 1520, without limitation.

K.      The Petitioners are entitled to all relief expressly set forth in 11 U.S.C. §§ 1521(a)–(b).

L.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted under 11 U.S.C. §§ 1517, 1520, and 1521.

Accordingly, it is hereby **ORDERED**:

1.      Each Proceeding is granted recognition as a foreign main proceedings under 11 U.S.C. §§ 1517(a) and 1517(b)(l).

2

2.      All relief afforded a foreign main proceeding under 11 U.S.C. § 1520 is granted.

3.      In accordance with 11 U.S.C. § 1520(a)(1), 11 U.S.C. §§ 361 and 362 apply to the Debtors and their property that is currently within or may be brought into the territorial jurisdiction of the United States.

4.      The Petitioners are authorized to file notices of these cases, the applicability of 11 U.S.C. §§ 361 and 362, and any other such notices the Petitioners deem necessary in any of the pending litigation wherein a Debtor is a party or any other proceeding.

5.      The Petitioners are authorized to operate the Debtors' business and exercise the powers of a trustee to the extent provided by 11 U.S.C. § 1520(a)(3), including, for the avoidance of doubt, drawing down on the Debtors' United States bank, securities, deposit, and similar accounts and making distributions in the Proceedings.

6.      In accordance with 11 U.S.C. § 1521(a), all persons and entities, other than the Petitioners and their representatives and agents, are hereby enjoined from (a) commencing or continuing an action or proceeding concerning the Debtors' assets, rights, obligations, or liabilities; (b) executing against any of the Debtors' assets; (c) taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff, or other claim against the Debtors or their property; (d) transferring, relinquishing, or disposing of any property of the Debtors to any person or entity other than the Petitioners; or (e) declaring or considering the commencement of the Proceedings or the Debtors' chapter 15 case a default under any agreement, contract, or arrangement.

7.      In accordance with section 1521(4) and the Federal Rules of Bankruptcy Procedure (the "*F.R.B.P.*"), the Petitioners are authorized to conduct the examination of

witnesses (including any and all parties or person subject to examination under F.R.B.P. 2004), the taking of evidence, or the delivery of information concerning the Debtors' assets, affairs, rights, obligations, or liabilities.

8.      In accordance with 11 U.S.C. §§ 1521(a)(5) and (b), the administration, realization, and distribution of the Debtors' assets located within the territorial jurisdiction of the United States are entrusted to the Petitioners, and the Petitioners are hereby established as the exclusive representatives of the Debtors in the United States.

9.      No action taken by the Petitioners, the Debtors, or their representatives in connection with these chapter 15 cases or any adversary proceeding filed by or against the them shall be deemed to constitute a waiver of the rights or benefits afforded such persons under 11 U.S.C. §§ 306 and 1510.

10.     A copy of this order shall be served, within five business days of entry of this order, by fax, e-mail, regular mail, or overnight courier upon all of the Debtors' known creditors and investors, the Office of the United States Trustee, and such other entities as the Court may direct.  Service in accordance with this Order shall constitute adequate and sufficient notice of the terms hereof.

11.     This Court shall retain jurisdiction with respect to the enforcement or interpretation of this Order and any request by any person or entity for relief from the provisions hereof.

###

Submitted by:

William S. Sugden
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
(404) 881-7000 (telephone)
Will.Sugden@alston.com

*Counsel to the Foreign Representatives*

William S. Sugden, Esq., shall serve a copy of this signed Order to all interested parties
immediately upon receipt of this Order and shall file a certificate of service with the Clerk of the
Court.

## SERVICE LIST

**Electronic Mail Notice List**

The following is the list of parties who are currently on the list to receive email notice/service for this case.

- Office of the US Trustee, USTPRegion21.MM.ECF@usdoj.gov

**Manual Notice List**

Sordo & Associates, P.A.
3006 Aviation Avenue, Suite 2A
Coconut Grove, Florida 33133

Reed Smith LLP
1001 Brickell Bay Drive
Suite 900
Miami, FL 33131

**Investors/Creditors via Electronic Mail**

| Name | Email |
|---|---|
| Pedro Pozo | 3d41pedro@gmail.com |
| Carmen Acosta | 3d41pedro@gmail.com |
| Arnoldo B. Lacayo | alacayo@sequorlaw.com |
| Alex Hernan Alarcon Sanchez | alexalarcon38@hotmail.com |
| Alejandro Mondolfi | amondolfi@gmail.com |
| Alejandro Mondolfi | amondolfi@gmail.com |
| Alvaro Muscio | amus42@gmail.com |
| Ana Milena Cobo | anamilecobo@hotmail.com |
| Angel Arias | angelbolivararias@gmail.com |
| Angel Fernandez | angelfdz1953@gmail.com |
| Ana Monge | anitam62@aol.com |
| Anali Tobi | anitobi@hotmail.com |
| Blas Daboin | blas.daboin@gmail.com |
| Carlos Bravo | bravo_car@hotmail.com; bravo_car@yahoo.com |
| Margarita Arcos Darquea | cachita42003@yahoo.es |
| Carlos Legaspy | carlos@insightamericas.net |
| Felicia Parson/Carlos Legaspy | carlos@insightamericas.net |
| Concepcion Gutierrez Cassini | cassini50@hotmail.com |
| Marcelo Novillo | ccnovillo@gmail.com |
| Cesar Arellano | cesarellano@icloud.com |

| Name | Email |
|------|-------|
| Jorge Chacin | chacinjorgeadvisor@gmail.com |
| Gonzalo Vorbeck | chalo.vorbeck@gmail.com |
| Claudio Marrone/ REP Fernando Martinez | cmarrone@spmgroup.com.ve |
| Carlos Nájera/Laura Acuña | crnajerad@hotmail.com |
| Diego Mussio | d.mussio@hotmail.com |
| Daniel Sauthier | Daniel.Sauthier@tecpetrol.com |
| David Palacios | david.palacios.p@gmail.com |
| Darren Azman | Dazman@mwe.com; Conor.Blake@sannegroup.com; Mark.Shaw@sannegroup.com; Rose.Hasler@sannegroup.com; Adrian.Bailie@sannegroup.com; IACapital@sannegroup.com; |
| Diego Young | diego_young@hotmail.com |
| Diego Vásquez | diegovasquezdavalos@gmail.com |
| Carlos Heras Cardenas | drheras725@gmail.com |
| Diogo Rossi Ibaixe | drossi@briix.com.br |
| Edwin Acosta Felton | eacostaf@hotmail.com |
| Ezequiel Aleman | ealeman@fedus.com.uy |
| Eduardo Battistini | eduba54@gmail.com |
| Emilie Bazin | Emilie.Bazin@syzgroup.com; SyzIam2@syzgroup.com |
| Erika Elizabeth Calderon Medina | erikaecm@hotmail.com |
| Eduardo Felipe Da Silva Soares | esoares@gaveainvest.com.br |
| Evelio Guerrero Alvarado | evelioguerreroa@hotmail.com |
| Fabio Missale | fabiomissale@icloud.com |
| Nelson Fazenda | fazenda.nelson@gmail.com |
| Federico Gil | Federico.gil4@icloud.com |
| Luis Fernando Lata Sanchez | fernando_lata_sanchez_130@hotmail.com |
| Francisco Estupiñan | festupinan@int-partners.com |
| Ferdinand Porak | fporak@falconam.com |
| freddy altamirano | freddy_altamirano2@yahoo.es |
| Fernando Taboada | ftaboadag@gmail.com |
| Luis Eduardo Guzmán Ocampo | geduardo567@gmail.com |
| Galo Aguirre | gerencia1@protonmail.com |
| Silvana Landazuri | gerencia1@protonmail.com |
| Gloria Benitez | gloria-ab2008@hotmail.com |
| Greg Holland | greg.holland@gmail.com |
| Gloria Vinueza | gvinueza@zonatrade.com |
| Hugo Jose Luis Garcia Poveda | hgarcia@blifetraining.com |

| Name | Email |
|------|-------|
| Ibrahim Reyes | ibrahimreyes3@gmail.com |
| Ibrahim Reyes | ibrahimreyesfert@gmail.com |
| Ignacio Ortelli | iortelli3@gmail.com |
| Isabel Ortiz Calderon | isabelaurelia@gmail.com |
| James Esparza Cisneros | james_esparza@offix-int.com |
| Javier Wright | javierwright@hotmail.com |
| Juan Carlos Calero | jcalero3007@gmail.com; jcalero@isabel.com.ec |
| Weilian Chen Lee | jlam_828@hotmail.com |
| Jose Miguel Varas | jm@varas.com |
| Juan Mendoza | jmendoza@sequorlaw.com |
| Marcelo Jorcin | jorcimar@yahoo.com |
| Jorge Villacis | jovillacis@yahoo.com |
| Juan Vieira Rey | juanvieirarey@yahoo.com |
| Jorge Wated | jwated@almacenesbuenhogar.com |
| Luisa Aray Merino | lachinaaray@yahoo.com |
| Laura Luna Gabor | lauralunagabor@hotmail.com |
| Jose Levy | levyped@gmail.com |
| Mary Levy | levyped@yahoo.com |
| Luis Gonzalez | lgonzalez@vidalink.com.br |
| Lucha Merino | luchaperez@yahoo.com |
| Luz Elvira Pazmino Gonzalez | lucypazminog@yahoo.com.ar |
| Luis Alberto Ludeña Jiménez | luis18gnr@hotmail.com |
| Elsa Guadalupe Molina Moncayo | lupitaguz@yahoo.com |
| Franco Cordivani | maloni@cantv.net |
| Monica Marcela Guerra Cabezas | marceguerrac@gmail.com |
| Maria Fernanda Franco | mariferfranco@hotmail.com |
| Martha Touzard | martha.touzard@gmail.com |
| Martin Litwak | martin.litwak@litwak-partners.com |
| Michele Behar | mbm.behar@gmail.com; paulo.cardoso@lhm.com.br |
| Marco Calero | mcalero@tadel.com.ec |
| Mercedes Fiorito de Augspach | mfiorito@regalosvip.com; federico.augspach@gmail.com |
| Miguel Verdias | miguel.verdias.sc@gmail.com |
| Mikelee Mauchi Bravo | mikemauchi@hotmail.com |
| Gladys Margarita Ochoa Egas | mochoae@yahoo.com |
| Mauricio Quintero | mquintero@bpi-gruposantander.com |
| Martin Trott | MTrott@RHSWCaribbean.com |
| Nicholas G. Arons | narons@katskykorins.com |
| Natalia Rubio | nataliarubiouy@hotmail.com |

| Name | Email |
|------|-------|
| Graciela Robles | negrarobles@yahoo.com |
| Patricia Sanchez | patrisan1960@gmail.com |
| Patty Correia | pattycorreia67@hotmail.com |
| Paul Ortega | paul_ortega@hotmail.com |
| Pablo L Perrotta | perropa123@gmail.com |
| Edison García Gualpa | proysec93@gmail.com |
| Roberto Cardoso | rcardosove@hotmail.com |
| Roberto Cardoso Somoza | rcardosove@hotmail.com; rcardosove@yahoo.com; |
| Ricardo Novoa Bejarano | rnoboab@noboabejarano.com |
| Rosa maldonado | rositavm@gmail.com |
| Sandra Ghirard | sandra@carmineristorante.com |
| Sandro Navas | sandronavas@navseguros.com |
| Servicios Juridicos | servicio.juridico@hotmail.com |
| Fabrian Yar | silfes2015@gmail.com |
| Silvana Landázuri M. | silvanalandazuri87@gmail.com |
| Sergio Mosquera | smosquera@crepesywaffles.ec |
| Sergio Pisano | spisanouy@gmail.com |
| Stroe Paul Viorel | spvstroe@gmail.com |
| Tracey Goodwin | Tracey.Goodwin@RaymondJames.com |
| Valentin Sainz | vsainz@yahoo.com |
| Ximena M Perez Martinz | xmperez@yahoo.com |
| Javier Pinto | xpintov@gmail.com |

# Exhibit "B"

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4399 / May 27, 2016

INVESTMENT COMPANY ACT OF 1940
Release No. 32130 / May 27, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17263

| | |
|---|---|
| In the Matter of<br><br>BISCAYNE CAPITAL INTERNATIONAL, LLC, ROBERTO G. CORTES, ERNESTO H. WEISSON, JUAN CARLOS CORTES, and FRANK R. CHATBURN<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Biscayne Capital International, LLC, Roberto G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes, and Frank R. Chatburn ("Respondents").

II.

In anticipation of the institution of these proceedings, each Respondent has submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.      These proceedings arise out of the failure of Biscayne Capital International, LLC ("BCI"), formerly a U.S. registered investment adviser, to disclose facts giving rise to multiple conflicts of interest and other material information under the Investment Advisers Act of 1940 (the "Advisers Act") in connection with the recommendation and sale of securities issued by private offshore investment companies under common beneficial ownership with BCI (hereinafter "Proprietary Products") to non-U.S. clients between August 2010 and March 2012 (the "Relevant Period"). Three BCI principals – Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson") and Juan C. Cortes ("Juan Cortes") (collectively "the Primary BCI Principals"[2]) – formed entities that issued the Proprietary Products primarily for the purpose of financing South Bay Holdings, LLC ("South Bay"), a Florida-based residential real estate developer, which itself was beneficially owned by Roberto Cortes and Weisson. In turn, South Bay was the majority beneficial owner of BCI during the Relevant Period.

2.      BCI failed to disclose, among other things, the Primary BCI Principals' beneficial ownership interest and role in the creation of the Proprietary Products issuers. Further, BCI failed to disclose additional material information under the Advisers Act concerning South Bay's financial condition, including that, both preceding and during the Relevant Period, South Bay failed to generate enough revenue or operating cash flow to meet maturing debt, or sustain operations absent obtaining the additional financing generated by the sale of Proprietary Products, and was required to renegotiate several past-due financial obligations. By doing so, BCI willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.

3.      Roberto Cortes, Weisson, and Juan Cortes created BCI and several affiliated non-U.S. financial services entities, all operating under the Biscayne Capital name, and marketed the Proprietary Products through their financial advisors, five of whom, including Frank Chatburn, they knew were employed by both BCI and the affiliated non-U.S. financial services entities.

4.      Roberto Cortes, Weisson and Juan Cortes each willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act by failing to prohibit the sales of the Proprietary Products through the U.S.-based BCI or, in the alternative, by failing to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act concerning the conflicts of  interest and South Bay's financial condition, when recommending Proprietary Products to BCI clients.[3]

---

[1] The findings herein are made pursuant to each Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] Other individuals, including Frank Chatburn, had a beneficial ownership interest in and were principals of BCI.

[3] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).

5. Frank Chatburn ("Chatburn"), who was both an investment adviser representative for BCI as well as an investment adviser for the non-U.S. financial services entities, willfully aided and abetted and caused BCI's violations of Section 206(1) and 206(2) of the Advisers Act by recommending and selling approximately $3.49 million in Proprietary Products to 29 non-U.S. BCI clients without making adequate disclosures under the Advisers Act. He failed to conduct a "fundamental analysis" of the Proprietary Products in contravention of representations in BCI's Form ADV; and failed to conduct an investigation or inquiry into, *inter alia*, the ownership or operation of Proprietary Product issuers or into South Bay's financial condition notwithstanding red flags concerning these entities. Chatburn also failed to disclose that he had a personal conflict of interest when recommending the Proprietary Products to BCI clients based on his beneficial ownership interest in BCI and the non-U.S. Biscayne Capital financial services entities as well as undisclosed compensation he received in connection with his recommendation and sale of the Proprietary Products to BCI clients.

6. Additionally, BCI willfully failed, and Juan Cortes willfully aided and abetted and caused BCI's failure, to design and implement policies and procedures reasonably designed to prevent violations of the Advisers Act. BCI also willfully made, and Roberto Cortes and Juan Cortes willfully aided and abetted and caused BCI to make, material misrepresentations in Form ADV. Additionally, during the Relevant Period, BCI, Roberto Cortes, and Juan Cortes each failed reasonably to supervise Chatburn.

## Respondents

7. **Biscayne Capital International, LLC ("BCI")**, formerly a Florida limited liability company headquartered in Miami, Florida, was an investment adviser registered with the Commission between October 14, 2008 and June 26, 2012. BCI provided discretionary and non-discretionary advisory services primarily to Latin American individuals and entities. BCI had approximately $12.8 million in assets under management ("AUM") as of December 31, 2011.

8. **Roberto G. Cortes ("Roberto Cortes")**, age 49, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Executive Officer. He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

9. **Ernesto H. Weisson ("Weisson")**, age 47, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period. He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

10. **Juan Carlos Cortes ("Juan Cortes")**, age 37, an Ecuadorian citizen and permanent resident of the United States residing in Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Operating Officer. Juan Cortes also served as BCI's Chief Compliance Officer until late 2011. Juan Cortes is a beneficial owner of, and directly or indirectly controls, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities. He also is Roberto Cortes' brother.

11. **Frank R. Chatburn ("Chatburn")**, age 37, a dual United States and Ecuadorian citizen residing in Miami, Florida, was a beneficial owner of BCI as well as an investment adviser representative of BCI during the Relevant Period. He also is a beneficial owner and financial adviser for the affiliated non-U.S. financial services entities. Chatburn is Roberto Cortes' cousin.

<u>Other Relevant Individuals and Entities</u>

12. **South Bay Holdings, LLC ("South Bay")**, a Florida limited liability company headquartered in Miami, Florida, is a private real estate development company that concentrates on residential real estate in South Florida. South Bay is beneficially owned by Roberto Cortes and Weisson.

13. **Sentinel Investment Fund, Ltd. ("Sentinel")**, a Proprietary Products issuer, is, according to private placement memoranda, "an exempted limited liability company of unlimited duration registered as a Segregated Portfolio Company" in the Cayman Islands. Sentinel was formed primarily for the purpose of financing the activities of South Bay through the sale of preferred shares to non-U.S. investors. Roberto Cortes, Weisson, and Juan Cortes are directors and beneficial owners of Sentinel.

14. **Spyglass Investment Management, Ltd. ("Spyglass")** is, according to the Sentinel private placement memoranda, "a company limited by shares" incorporated in the British Virgin Islands. Spyglass served as the investment adviser to Sentinel and certain of the other Proprietary Products issuers during the Relevant Period. Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period. Roberto Cortes, Weisson and Juan Cortes beneficially own Spyglass. Spyglass has never been registered with the Commission.

15. **SG Strategic Income, Ltd. ("SG Strategic")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued four series of notes to non-U.S. investors during the Relevant Period. SG Strategic primarily invested in "non[-]registered private mortgage backed notes" issued by South Bay through Sentinel and in membership interests issued by South Bay. Roberto Cortes, Weisson and Juan Cortes beneficially own SG Strategic.

16. **GMS Global Step Up Note, Ltd. ("GMS")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued three series of notes to non-U.S. investors during the Relevant Period. GMS primarily invested in "non-registered private mortgage backed notes" issued by South Bay. Roberto Cortes, Weisson and Juan Cortes beneficially own GMS.

<u>Facts</u>

**A. The Common Beneficial Ownership and Effective Control of BCI, the Proprietary Products Issuers and South Bay Created a Conflict of Interest for BCI.**

17. Roberto Cortes and Weisson formed and began operating South Bay, a residential real estate development company, in approximately 1999. Between 1999 and approximately 2005, South Bay concentrated on residential real estate development in Key Biscayne, Florida. South

Bay's business activities expanded significantly in 2006 and 2007 when South Bay acquired 29 lots and associated club memberships in an exclusive resort in South Florida (the "Resort"). Until approximately 2007, South Bay's business activities were financed primarily through commercial bank loans and investments from friends and family.

18.     The Primary BCI Principals and a related individual formed Sentinel, the first of the Proprietary Products issuers, in approximately 2006 for the primary purpose of financing South Bay's activities through the issuance of preferred shares to non-U.S. investors. Starting in 2010, they formed additional Proprietary Products issuers, including SG Strategic and GMS, for the purpose of financing South Bay's activities through the issuance of notes to non-U.S. investors. During the Relevant Period, Roberto Cortes and Weisson each beneficially owned 40 percent of the Proprietary Products issuers and Juan Cortes beneficially owned 10 percent. These three principals were also directors of Sentinel during the Relevant Period. An affiliated entity under the effective control of the beneficial owners provided administrative and accounting support to the Proprietary Products issuers. The Primary BCI Principals, as the beneficial equity owners of the Proprietary Products issuers, stood to receive any profits generated by those entities. The basic beneficial ownership structure of the Proprietary Products is as follows:[4]



19.     Generally, the Proprietary Products issuers invested the proceeds of the notes sold to non-U.S. investors in promissory notes issued by South Bay backed by non-registered mortgages,[5] although certain Proprietary Products issuers invested in membership certificates issued by South Bay.

20.     The Primary BCI Principals, and a related individual, also beneficially owned Spyglass, an offshore investment adviser to certain of the Proprietary Products issuers. Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period, including responsibility for valuing the investments that certain of the Proprietary Products issuers made in South Bay.

---

[4] The Proprietary Products issuers were beneficially owned by these individuals through a holding company that is not represented in this chart. None of the Proprietary Products' offerings was registered under the Securities Act of 1933 and, under the terms of the offering memoranda, the securities were prohibited from sale to U.S. persons.

[5] The non-registered mortgages executed by South Bay in favor of the Proprietary Products issuers were not recorded in Florida. Any recorded mortgages on the properties at issue would have priority over non-registered mortgages.

21.     Starting in approximately 2005, Roberto Cortes, Weisson, and Juan Cortes formed several non-U.S. financial services entities operating under the Biscayne Capital name.  Together with Chatburn, they formed BCI in 2008.  Roberto Cortes and Weisson beneficially owned through South Bay approximately 61 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period.  Juan Cortes and Chatburn each beneficially owned between 8 and 9 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period. The basic beneficial ownership structure of the Biscayne Capital entities is as follows:[6]



22.     As the majority beneficial owner of the Biscayne Capital entities, South Bay invested millions of dollars in capital contributions for the benefit of those entities during the Relevant Period.

23.     The common beneficial ownership and effective control of BCI, the Proprietary Products Issuers and South Bay created a conflict of interest that, under the Advisers Act, should have been disclosed when BCI recommended and sold the Proprietary Products to BCI clients.

**B.  South Bay's Financial Condition During the Relevant Period Created a Conflict of Interest for BCI.**

24.     By 2009, the combination of the global financial crisis, the accompanying disruption of the South Florida real estate market, and numerous development delays relating to the Resort caused financial difficulties for South Bay.

25.     Between approximately 2007 and late 2009, Weisson and Roberto Cortes, the co-owners of South Bay, spent significant time and resources drafting development plans, seeking permits, and making preparations to develop 17 contiguous lots of the 29 total Resort lots as a single project.  One plan involved developing fractional ownership units.  Another plan involved developing a luxury retirement community.  However, the single project development plans ultimately did not move forward for various reasons.  Consequently, in 2010, South Bay began drafting new development plans to build single family homes on the lots over a six-year period, with rental income starting in late 2012 and home sales starting in 2013 and continuing through

---

[6] The Biscayne Capital entities were beneficially owned by these individuals and entities through a holding company that is not represented in this chart.

2016. The development delays stretched into the heart of the financial crisis, leaving South Bay with little revenue and increasing carrying costs.[7]

26.     As later reported in its audited financials, throughout the Relevant Period, South Bay failed to generate enough revenue or operating cash flows to pay off maturing debt, sustain its operations or fund its development plans without obtaining additional financing. Audits completed subsequent to the Relevant Period showed that South Bay had significant net negative cash flows from operations in 2010, 2011 and 2012. During this period, its annual interest costs rose to approximately $12.6 million in 2010, $10.7 million in 2011, and $11.5 million in 2012.[8] South Bay was also required to renegotiate certain past due financial obligations prior to and during the Relevant Period.[9]

27.     South Bay's financial condition during this period created a conflict of interest for BCI under the Advisers Act, and, thus, should have been disclosed when it recommended and sold the Proprietary Products to BCI clients.

### C. BCI's Dependence on South Bay for Financial Support During the Relevant Period Created a Conflict of Interest for BCI.

28.     BCI did not generate revenues sufficient to sustain operations during the Relevant Period without obtaining additional funding.

29.     South Bay, as the majority beneficial owner of BCI, provided capital contributions to BCI necessary to support its operations during the Relevant Period.

30.     BCI's dependence on South Bay for capital contributions during the Relevant Period created a conflict of interest for BCI that, under the Advisers Act, should have been disclosed in connection with the recommendation and sale of Proprietary Products to BCI clients.

### D. Roberto Cortes, Weisson and Juan Cortes Developed, Marketed, and Sold Proprietary Products to Finance South Bay's Operations.

31.     In 2010 and 2011, while South Bay was struggling to service its existing debt obligations and repay maturing debt to Sentinel, the Primary BCI Principals formed Proprietary Products issuers for the primary purpose of raising additional investor funds to sustain South Bay's operations, meet its existing loan obligations and finance its new real estate development plans.

---

[7] In contrast to the six-year single family home development plan for the Resort lots, South Bay had previously expected all of the homes in the luxury retirement community project to be sold in advance of construction with construction financed by the individuals who purchased the homes and to take 12 to 15 months to complete.

[8] This includes interest incurred and charged to operations as well as interest incurred and capitalized.

[9] The largest past-due obligations concerned loans made by Sentinel to South Bay between 2007 and 2010. The past-due obligations, which exceeded $41 million by September 2010, were renegotiated on several occasions, each time with Roberto Cortes acting on behalf of Spyglass and Sentinel, and Weisson acting on behalf of South Bay.

32.     The Primary BCI Principals formed SG Strategic in the Cayman Islands in March 2010 and issued its first series of notes – Sentinel Investment Fund SPC Linked Series 7.3 Notes ("SG Series 7.3") – to non-U.S. investors starting in July 2010. SG Strategic invested the proceeds from the first series of notes in preferred shares of Sentinel. BCI, through Chatburn, recommended and sold SG Series 7.3 Notes to non-U.S. BCI clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

33.     SG Strategic issued three additional series of notes in June 2011: (1) SBH Diversified Preferred Income 2014 (offering commenced in June 2011 and matured in May 2014); (2) SBH Diversified Preferred Income 2016 (offering commenced June 2011 and matures in May 2016); and (3) SBH Diversified Preferred Income 2018 (offering commenced in June 2011 and matures in May 2018) ("SBH 2014," "SBH 2016," and "SBH 2018," respectively). SG Strategic invested the proceeds from those three series directly in membership certificates issued by South Bay. South Bay treated the investment as an equity investment for purposes of its financial statements. BCI, through Chatburn, recommended and sold SBH 2016 and SBH 2018 to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

34.     The Primary BCI Principals also formed GMS, which issued three series of notes in December 2011. The proceeds of these note issuances primarily were invested in Sentinel and in non-registered private mortgage backed notes issued by South Bay. BCI, through Chatburn, recommended and sold GSM Global Step Up Note, Ltd. Series 3 ("GMS Series 3") to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

### E.  BCI Willfully Breached its Fiduciary Duty Under the Advisers Act By Failing to Disclose Conflicts of Interest and Material Information Concerning South Bay's Financial Condition When Recommending to Its Clients the Proprietary Products.

35.     Chatburn, a BCI investment adviser representative, exercised his discretionary authority to purchase[10] or otherwise recommended the purchase of approximately $3.49 million in Proprietary Products in 29 separate BCI client accounts between August 30, 2010 and March 27, 2012. Chatburn also recommended that certain BCI client accounts sell approximately $104,000 in Proprietary Products during that period. Chatburn's recommendations to BCI clients related to four Proprietary Products: (1) SG Series 7.3 Notes; (2) SBH 2016; (3) SBH 2018; and (4) GMS Series 3.

36.     As a U.S. investment adviser, BCI had a fiduciary duty under the Advisers Act to exercise the utmost good faith in dealing with clients – including to fully and fairly disclose all material information which might incline an investment adviser consciously or unconsciously to render advice which is not disinterested and to employ reasonable care to avoid misleading clients. As a BCI investment adviser representative, Chatburn had the same fiduciary duty to his and BCI's clients. It is the client, not the investment adviser, who is entitled to determine whether a conflict

---

[10] Chatburn had discretion over most of his clients' accounts.

of interest might cause an investment adviser – consciously or unconsciously – to render advice that is not disinterested.

37.     In recommending to its clients the Proprietary Products described above, BCI failed to disclose the previously articulated conflicts of interest relating to the Proprietary Products as well as material information concerning South Bay's financial condition.  In doing so, BCI breached its fiduciary duty under the Advisers Act to those clients.

38.     All the Proprietary Products' offering memoranda during the Relevant Period were silent as to BCI's conflicts of interest and South Bay's financial condition.  Chatburn failed to disclose to clients various conflicts of interest, such as South Bay's financial condition or the fact that the Proprietary Products issuers were formed and beneficially owned and controlled by the Primary BCI Principals.  Similarly, Chatburn failed to disclose that Roberto Cortes and Weisson were responsible for determining the value of certain of the Proprietary Products issuers' investments in South Bay.  Further, Chatburn failed to disclose that the Primary BCI Principals owned Spyglass or that Spyglass had delegated its responsibilities to Roberto Cortes during most of the Relevant Period.

39.     Chatburn also failed to disclose material information under the Advisers Act relating to South Bay's financial condition to BCI clients who purchased the Proprietary Products.

**F.  Roberto Cortes, Weisson, and Juan Cortes Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Regarding South Bay's Financial Condition.**

40.     Roberto Cortes, Weisson, and Juan Cortes developed the Proprietary Products to finance South Bay's real estate operations.  An essential component of their effort was to sell the Proprietary Products through their financial advisers, five of whom, including Chatburn, they knew were employed by both BCI and the affiliated non-U.S. Biscayne Capital financial services entities.  Roberto Cortes, Weisson, and Juan Cortes encouraged the sale of Proprietary Products by providing these financial advisers offering memoranda, term sheets and presentations concerning South Bay.  However, Roberto Cortes, Weisson, and Juan Cortes failed to take steps to ensure that the Proprietary Products were not sold through BCI or, in the alternative, to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act in connection with any such BCI sales.  For example, they failed to take steps to inform BCI investment adviser representatives that Proprietary Products sales should be made only through the affiliated non-U.S. financial services entities and no recommendations or sales should be made through BCI.  Nor did they take steps to prevent trade tickets relating to Proprietary Products from being entered for BCI or to monitor BCI for Proprietary Product sales.  They failed to provide training to BCI's investment adviser representatives to highlight regulatory differences between recommending Proprietary Products through their affiliated non-U.S. financial services entities and those required when recommending and selling through BCI, a U.S. registered investment adviser.  Further, they knew that BCI's compliance manual was silent as to the sale of Proprietary Products through BCI.

41.     Roberto Cortes, Weisson and Juan Cortes failed to detect that Chatburn engaged in Proprietary Product sales through BCI client accounts during a period of more than 18 months

even though they knew that, at least as of July 30, 2010, Chatburn's assets under management at BCI amounted to more than half of BCI's total assets under management at that time and even though Roberto Cortes and Juan Cortes were designated as his supervisors at BCI. They also knew that Chatburn had a significant portion of clients' assets invested in Proprietary Products during the Relevant Period. Nonetheless, they did not review or otherwise direct that a review be conducted of Chatburn's BCI accounts to ensure that no Proprietary Products were being sold through BCI.

**G. Chatburn Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Concerning South Bay by Failing to Conduct a Fundamental Analysis or Reasonable Due Diligence Concerning the Proprietary Products.**

42. Chatburn knew or was reckless in not knowing that BCI failed to disclose conflicts of interest and material information under the Advisers Act concerning South Bay's financial condition when recommending Proprietary Products to BCI's non-U.S. clients.

43. Chatburn knowingly or recklessly failed to conduct a "fundamental analysis" or reasonable due diligence under the Advisers Act of the Proprietary Products before recommending them to BCI clients, in contravention of BCI's affirmative disclosures in its Form ADV. Part 2A of BCI's Form ADV dated March 2011, which was delivered to clients, stated that BCI's "Financial Advisors conduct fundamental analysis on all securities recommended for client accounts." In the case of stocks and bonds, BCI's Form ADV represented that the analysis generally included a review of the issuer's management, the amount and volatility of past profits or losses, the issuer's assets and liabilities, as well as any material changes from historical norms, prospects for the issuer's industry, as well as the issuer's competitive position within the industry, and any other factors considered relevant. Chatburn took no steps to review similar information relating to the Proprietary Products issuers.

44. Aside from having knowledge of the coupon rate, the maturity term, and the fact that the Proprietary Products invested in some form in South Bay, Chatburn failed to conduct a "fundamental analysis" of essential features of those products, before recommending them to BCI clients. For example, even though the Proprietary Products notes issued to investors were unsecured debt obligations of the Proprietary Products issuers, Chatburn had an insufficient understanding that BCI's clients had credit risk with respect to the Proprietary Products issuers. Additionally, Chatburn had no understanding as to who owned and managed the Proprietary Products issuers, or the role of Spyglass, the investment adviser to several of the Proprietary Products issuers. Similarly, Chatburn had an insufficient understanding as to the nature of the investments that the Proprietary Products issuers made in South Bay, and did not understand or inquire about the meaning of basic terms in the offering memoranda describing such investments, such as "non-registered private mortgage-backed notes," which was the primary investment made by the Proprietary Products issuers in South Bay. Chatburn also had no understanding as to what rights or recourse, if any, the Proprietary Products issuers had against the underlying assets of South Bay in the event of default (*i.e.*, whether the Proprietary Products issuers had obtained collateral or whether other persons or entities had priority rights to the collateral over the Proprietary Products issuers). Instead, Chatburn relied on his personal relationship with Roberto

Cortes and Weisson, his personal belief that they would be successful in South Bay, and the fact that he visited and observed the South Bay construction sites.

45.     Further, Chatburn knowingly or recklessly ignored information available to him that should have caused him – in exercising his fiduciary duty of care under the Advisers Act as an investment adviser representative – to conduct heightened due diligence on the Proprietary Products that he recommended to BCI clients.  That information included, but is not limited to the following: (1) the Proprietary Products issuers were newly formed small private issuers with no operating history; (2) Spyglass, the investment adviser to several of the Proprietary Products issuers, also was a newly formed company at the time that Sentinel commenced, with no operating history; (3) the investment funds raised by these newly formed Proprietary Products issuers were to be invested in South Bay, a privately owned real estate business that Chatburn knew to be under common beneficial ownership and control with BCI; (4) several of the offering memoranda prior to June 2012 failed to mention South Bay, even though Chatburn knew that to be the primary, if not exclusive, investment being made by the Proprietary Products issuers; and (5) the Proprietary Product offering memoranda indicated that the issuers would not be audited.  Chatburn also had no understanding as to South Bay's underlying financial condition, its profitability, or its creditworthiness, and conducted no investigation or inquiry of South Bay's finances despite the severe real estate crisis in South Florida during the Relevant Period.  Notwithstanding those red flags, Chatburn failed to conduct any investigation relating to the Proprietary Products issuers before recommending Proprietary Products to BCI clients.

46.     In making his recommendations to BCI clients concerning the Proprietary Products, neither Chatburn nor BCI disclosed Chatburn's personal conflicts of interest arising from his beneficial ownership interest in BCI.  Chatburn knew that he had some beneficial ownership interest in BCI.  He also knew that South Bay invested in BCI and that the Proprietary Products that he recommended to non-U.S. BCI clients financed South Bay.  Further, Chatburn failed to disclose that he received additional compensation from one of the affiliated non-U.S. Biscayne Capital financial services entities beyond his share of the disclosed BCI investment management fees charged to BCI clients in connection with the recommendation of Proprietary Products to BCI clients.  Chatburn breached his fiduciary duty under the Advisers Act to those clients in failing to disclose information regarding his personal conflicts of interest.

### H.  Failure to Supervise Frank Chatburn.

47.     As a result of the conduct described above, BCI, Roberto Cortes, and Juan Cortes failed reasonably to supervise, with a view to preventing violations of the Advisers Act, the activities of Frank Chatburn during the Relevant Period.  Both Roberto Cortes, in his capacity as CEO, and Juan Cortes, in his capacity as CCO, were designated by BCI as supervisors of Frank Chatburn.

48.     Between August 2010 and March 2012, Chatburn recommended and sold approximately $3.49 million in Proprietary Products to approximately 29 non-U.S. BCI client accounts.  As previously discussed, BCI established no procedures relating to the sale of Proprietary Products through BCI and had no system for applying such procedures that would reasonably be expected to prevent and detect, insofar as practicable, violations relating to the sale

of Proprietary Products. With respect to Form ADV representations concerning the monitoring and review of BCI accounts, neither Roberto Cortes nor Juan Cortes took adequate steps to conduct such monitoring and reviews with a view to preventing violations of the securities laws.

## I. BCI Failed to Adopt and Implement Written Policies and Procedures Reasonably Designed to Prevent Violations of the Investment Advisers Act.

49.     BCI failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Investment Advisers Act.

50.     Juan Cortes was responsible for developing a compliance program for BCI and operated as its Chief Compliance Officer until late 2011. However, he had no specific training as a compliance officer. BCI's compliance manual provided that the Chief Compliance Officer was responsible for the successful implementation of the policies and procedures contained in the manual as well as for training employees on compliances issues, ensuring that employees with specific compliance responsibilities competently performed their jobs, and ensuring the timely review of compliance issues. The Compliance Manual further provided that the Chief Compliance Officer was responsible for ensuring that BCI's compliance program remained "robust, comprehensive, and current, and reasonably designed to identify conflicts of interest and other areas that may expose [BCI] to increased regulatory and compliance risk." Nonetheless, Juan Cortes failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder, especially surrounding the sale of products in which BCI or its principals had a financial interest.

51.     Further, BCI's compliance manual – purchased off-the-shelf from a third party – was not reasonably tailored to BCI's business practices until 2012 and BCI did not have any written policies and procedures regarding the recommendation of Proprietary Products through BCI.

## J. BCI Made Material Misstatements in Form ADV.

52.     BCI made material misstatements in Form ADV during the Relevant Period. Roberto Cortes signed BCI's Form ADV filings. Juan Cortes was primarily responsible for preparing BCI's Form ADV filings and provided factual information as requested to a third party consultant for the purpose of completing BCI's Form ADV filings.

53.     For example, BCI misrepresented in Item 8 of Part 1A of Form ADV as filed with the Commission on July 21, 2011 that neither BCI nor any "any *related person* … recommends securities (or other investment products) in which [BCI] or any *related person* has some proprietary (ownership) interest …."[11] Chatburn had recommended securities issued by the Proprietary Products issuers, which were beneficially owned by the other BCI principals, to BCI clients prior to July 21, 2011 and continued to recommend them after that date.

---

[11] The instructions to Form ADV define related person as any advisory affiliate and any person that is under common control with the firm. Advisory affiliates are defined as (1) all of the adviser's officers, partners, or directors or any persons performing similar functions; (2) all persons directly or indirectly controlling or controlled by the adviser; and (3) all of the adviser's current employees.

54.     BCI misrepresented that it had $150 million in AUM in its March 2011 Form ADV Part 2A based on sub-advisory agreements with certain of the affiliated non-U.S. Biscayne Capital financial services entities and in its July 21, 2011 Form ADV even though BCI never actually provided such services.

55.     BCI also misrepresented the assets managed by Frank Chatburn in prior jobs in Part 2B of Form ADV.  Form ADV represented that Chatburn managed "a $200 million book of business" at Wachovia.  In reality, Chatburn only managed approximately $50-60 million at Wachovia and never reviewed his biographical information in Form ADV.

56.     BCI misrepresented in Part 2A of Form ADV that BCI's investment adviser representatives "conduct fundamental analysis on all securities recommended for client accounts." Chatburn did not conduct a fundamental analysis of the Proprietary Products or the Proprietary Products issuers.  Rather, he visited South Bay's development sites and trusted that South Bay would be successful based on his relationship with Roberto Cortes and Weisson.

57.     BCI misrepresented that "[a]ccounts under Biscayne Capital's management are monitored on an ongoing basis by the Management members and the Compliance Department" when in reality BCI did not have a functioning compliance department and did not adequately monitor BCI's accounts on an ongoing basis.

58.     BCI misrepresented that Roberto Cortes was the Chief Compliance Officer in the Form ADV from 2008 until July 2011, when in fact Juan Cortes was the Chief Compliance Officer.

## Violations

59.     As a result of the conduct described above, BCI willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to (1) "employ any device, scheme, or artifice to defraud any client or prospective client" or (2) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  Also as a result of the conduct described above, Frank R. Chatburn willfully aided and abetted and caused BCI's violations of Sections 206(1) and 206(2) of the Advisers Act.  Roberto G. Cortes, Ernesto H. Weisson, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act.

60.     As a result of the conduct described above, BCI willfully violated, and Roberto G. Cortes and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 207 of the Advisers Act, which makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission … or willfully to omit to state in any such application or report any material fact which is required to be stated therein."

61.     As a result of the conduct described above, BCI willfully violated, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which require investment advisers to, among other things, adopt

and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and its rules.

62.     As a result of the conduct described above, BCI, Roberto G. Cortes, and Juan Carlos Cortes failed reasonably to supervise Chatburn, with a view to preventing violations of the federal securities laws, while Chatburn was subject to their supervision, within the meaning of Section 203(e)(6) of the Advisers Act.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.     Respondent BCI cease and desist from committing or causing any violations and any future violations of Sections 206(1), 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder.

B.     Respondent BCI is censured.

C.     Respondent Frank R. Chatburn cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act.

D.     Respondent Frank R. Chatburn be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and

> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after four (4) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E.     Respondent Roberto G. Cortes cease and desist from committing or causing any violations and any future violations of Sections 206(2), and 207 of the Advisers Act.

F.     Respondent Roberto G. Cortes be, and hereby is:

> > barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
> >
> > prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

> G.     Respondent Juan Carlos Cortes cease and desist from committing or causing any violations and any future violations of Sections 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder.

> H.     Respondent Juan Carlos Cortes be, and hereby is:

> > barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
> >
> > prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission

> I.     Respondent Ernesto H. Weisson cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act.

> J.     Respondent Ernesto H. Weisson be, and hereby is:

> > barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
> >
> > prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

K.      Any reapplication for association by Respondents Frank R. Chatburn, Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

L.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay disgorgement of $30,024 and prejudgment interest of $3,063 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

M.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay disgorgement of $78,924 and prejudgment interest of $8,052 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

N.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $125,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

O.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

P.      Respondents Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson shall each, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $50,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Q.      Payment must be made in one of the following ways:

(1)     Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BCI, Roberto G. Cortes, Juan Carlos Cortes, Ernesto H. Weisson, or Frank R. Chatburn as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Michael J. Osnato, Chief, Complex Financial Instrument Unit, Division of Enforcement, Securities and Exchange Commission, 200 Vesey Street, Suite 4000, New York, New York 10281.

R.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents BCI, Frank R. Chatburn, Roberto G. Cortes, Juan C. Cortes and Ernesto H. Weisson agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of their payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents BCI, Frank R. Chatburn, Roberto G. Cortes, Juan C. Cortes and Ernesto H. Weisson agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.


Brent J. Fields
Secretary

# Exhibit "C"

| | |
|---|---|
| **From:** | Fernando Haberer <fhb@pbadvisor.net> |
| **Sent:** | 6/6/2018 4:09:56 PM +0000 |
| **To:** | Fernando Haberer <fhb@pbadvisor.net> |
| **Subject:** | FW: *Confidential: RE: Re: Privileged & Confidential |
| **Attachments:** | image001.gif; image002.jpg; image003.gif |

**From:** "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>
**Date:** Thursday, September 25, 2014 at 11:12 AM
**To:** "aavila@arhmf.com" <aavila@arhmf.com>
**Cc:** "CGarcia@arhmf.com" <CGarcia@arhmf.com>, "EMuelle@arhmf.com" <EMuelle@arhmf.com>, Fernando Haberer <fhb@pbadvisor.net>, "juan.cortes@biscaynecapital.com" <juan.cortes@biscaynecapital.com>
**Subject:** Re: *Confidential: RE: Re: Privileged & Confidential

Dear Alcides/Erik,

I hope this email find you well.

Please be informed that the documents I need for our internal compliance are the following:

## Documents regarding SBH/VG

1. Copy of Memorandum and Articles of Association and last Financial Statements

2. Copy of Certificate of Incorporation

3. Organization chart of the company and its economic group (Full description of the ownership, jurisdiction, branches, agencies or place of business involved must be detailed in the chart)

Date of the Organization Chart: _

4. Copy of Stock Register Book (in case of Registered Shares); or

Copy of the Custodian Agreement (in case of Bearer Shares)

## Documents regarding SME / SPVs / LLCs

1. Copy of Memorandum and Articles of Association and last Financial Statements.

2. Copy of Certificate of Incorporation

3. Organization chart of the company and its economic group (Full description of the ownership, jurisdiction, branches, agencies or place of business involved must be detailed in the chart)

Date of the Organization Chart: _

4. Copy of Stock Register Book (in case of Registered Shares); or

Copy of the Custodian Agreement (in case of Bearer Shares)

## Documents regarding the Bonds

1. Copy of the terms and conditions of the Bonds

2. Copy of the Bond

3. Copy of the Agreement with the Bank as Bond holder

Thank you!

JP

*Best regards,*



**Juan Pablo Demichelis**
*Senior Trust Officer*

**Amicorp Curaçao B.V.**
Pareraweg 45 I P.O. Box 4814 I Curaçao
Tel.: +599 (9) 434 3500 I Fax.: +599 (9) 434 3533 I Direct: +599(9) 434 3578 I VOiP:3578

J.Demichelis@amicorp.com I Skype: jpdmchls

www.amicorp.com

Please consider the environment before printing this message.

---09/19/2014 07:58:38 PM---<graycol.gif>Juan Carlos Cortes ---09/19/2014 03:05:53 PM---Ok. This is what I suggest: We meet at noon with Erik. At 1 we do a

From: <aavila@arhmf.com>
To: <juan.cortes@biscaynecapital.com>

Cc: <J.Demichelis@amicorp.com>, <CGarcia@arhmf.com>, <EMuelle@arhmf.com>, <fhb@pbadvisor.net>
Date: 09/19/2014 07:58 PM
Subject: Re: *Confidential: RE: Re: Privileged & Confidential

Sorry for the inconvenience but I had previously indicated that I was not available Wednesday morning.

Sent from my iPad

On Sep 19, 2014, at 3:32 PM, "Juan Carlos Cortes" <juan.cortes@biscaynecapital.com> wrote:

> Erik,
> Do confirm to meet at noon at your office? Break at 1:09 and then reconvene to go over items
> with Al for about 30 minutes?
>
> If so, maybe Cintya can send us an invite.
>
> Juan C. Cortes
>
> On Sep 19, 2014, at 3:11 PM, "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>
> wrote:
>
> > Ok. Great!
> >
> > Please let me know the please of the meeting and the time that your prefer to start.
> >
> > Thank you.
> >
> > JP

*Best regards,*

<36945088.gif    **Juan Pablo Demichelis**
>                *Senior Trust Officer*

                 Amicorp Curaçao B.V.
                 Pareraweg 45 | P.O. Box 4914 | Curaçao
                 Tel.: +599 (9) 434 3500 | Fax.: +599 (9) 434 3533 | Direct: +599(9) 434 3578 | VOIP:3578

J.Demichelis@amicorp.com | Skype: jpdmchls

www.amicorp.com

<36343743.jpg>Please consider the environment before printing this message.

<graycol.gif>Juan Carlos Cortes ---09/19/2014 03:05:53 PM---Ok. This is what I suggest: We meet at noon with Erik. At 1 we do a lunch break and JPD leaves to ai

From: **Juan Carlos Cortes** <juan.cortes@biscaynecapital.com>
To: "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>,
Cc: "savlla@arhmf.com" <savlla@arhmf.com>, "CGarcia@arhmf.com" <CGarcia@arhmf.com>, "EMuelle@arhmf.com"
<EMuelle@arhmf.com>, "fhb@pbadvisor.net" <fhb@pbadvisor.net>
Date: **09/19/2014 03:05 PM**
Subject: **Re: "Confidential: RE: Re: Privileged & Confidential**

Ok. This is what I suggest:

We meet at noon with Erik. At 1 we do a lunch break and JPD leaves to airport. The rest of us reconvene at 2 back at Al's office. We do a summary and recap for Al.

Juan C. Cortes

On Sep 19, 2014, at 2:44 PM, "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com> wrote:

> Juan Carlos,
>
> I have the flight at 4 pm. That is the reason why I suggest staring the meeting in the morning. We can star in the morning and then continue up to 1 pm.
>
> As well I can offer to have dinner on Tuesday and discuss the project in the evening. I will arrive to Miami around 7 pm.
>
> Tks.
>
> JP
>
> *Best regards,*

<15455991.gif  **Juan Pablo Demichelis**
>              *Senior Trust Officer*

**Amicorp Curaçao B.V.**
Pararaweg 45 I P.O. Box 4914 I Curaçao
Tel.: +599 (9) 434 3500 I Fax.: +599 (9) 434 3533 I Direct: +599(9) 434 3578 I VOIP:3578

J.Demichelis@amicorp.com I Skype: jpdmchls

www.amicorp.com

<15034954.jpg>Please consider the environment before printing this message.

<graycol.gif>Juan Carlos Cortes ---09/19/2014 02:30:03 PM---Juan Pablo, Are you ok with this schedule?

From: **Juan Carlos Cortes** <juan.cortes@biscaynecapital.com>
To: "CGarcia@arhmf.com" <CGarcia@arhmf.com>
Cc: "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>, "aavila@arhmf.com" <aavila@arhmf.com>, "EMuelle@arhmf.com" <EMuelle@arhmf.com>, "fnb@pbadvisor.net" <fnb@pbadvisor.net>
Date: **09/19/2014 02:30 PM**
Subject: Re: *Confidential: RE: Re: Privileged & Confidential

---

Juan Pablo,

Are you ok with this schedule?

Juan C. Cortes

On Sep 19, 2014, at 2:25 PM, "CGarcia@arhmf.com" <CGarcia@arhmf.com> wrote:

> Mr. Avila can be there at 2pm.
>
> Cintya
>
> **From:** Juan Carlos Cortes [mailto:juan.cortes@biscaynecapital.com]

**Sent:** Friday, September 19, 2014 2:24 PM
**To:** Cintya Garcia (X3812)
**Cc:** J.Demichelis@amicorp.com; Al Avila (X3570); Erik Muelle (X3576); fhb@pbadvisor.net
**Subject:** Re: *Confidential: RE: Re: Privileged & Confidential

Cintya,

But will Al be available at 2:00pm per your prior email, correct? . I prefer to schedule a set time. Maybe we can start with Erik at 1:00pm and Alcides joins at 2:00.

Juan C. Cortes

On Sep 19, 2014, at 2:14 PM, "CGarcia@arhmf.com" <CGarcia@arhmf.com> wrote:

> The meeting Mr. Avila has in the morning cannot be cancelled or postponed. Mr. Erik Muelle can meet with you and the group in the morning. Mr. Avila will try to join the meeting in the afternoon; however, I cannot guarantee he will make it.
>
> Cintya
>
> **From:** J.Demichelis@amicorp.com [mailto:J.Demichelis@amicorp.com]
> **Sent:** Friday, September 19, 2014 1:52 PM
> **To:** juan.cortes@biscaynecapital.com
> **Cc:** Al Avila (X3570); Cintya Garcia (X3812); Erik Muelle (X3576); fhb@pbadvisor.net
> **Subject:** Re: *Confidential: RE: Re: Privileged & Confidential
>
> Juan Carlos,
>
> Alcides cannot change his meeting? I will be available the whole morning, then in the afternoon I do not have much time cos I have to go to the airport. I have other meetings in Curacao on Thursdays.
>
> Tks,
>
> JP

*Best regards,*

&lt;image001.jpg&gt;**Juan Pablo Demichelis**
*Senior Trust Officer*

**Amicorp Curaçao B.V.**
Pareraweg 45 I P.O. Box 4914 I Curaçao
Tel.: +599 (9) 434 3500 I Fax.; +599 (9) 434 3533 I Direct: +599(9) 434 3578 I VOIP:3578

J.Demichelis@amicorp.com I Skype: jpdmchis

www.amicorp.com

&lt;image002.jpg&gt;Please consider the environment before printing this message.

&lt;image003.gif&gt;Juan Carlos Cortes ---09/19/2014 01:46:06 PM---Juan Pablo, Do you mind arranging your travel schedule in order to meet with Alcides at 2:00pm?

From: **Juan Carlos Cortes** <juan.cortes@blacswecapital.com>
To: "CGarcia@arhmf.com" <CGarcia@arhmf.com>
Cc: "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>, "asvila@arhmf.com" <asvila@arhmf.com>, "EMuelle@arhmf.com" <EMuelle@arhmf.com>, "fhb@pbadvisor.net" <fhb@pbadvisor.net>
Date: 09/19/2014 01:46 PM
Subject: **Re:** "Confidential: RE: Re: Privileged & Confidential

---

Juan Pablo,

Do you mind arranging your travel schedule in order to meet with Alcides at 2:00pm?

Juan C. Cortes

On Sep 19, 2014, at 1:44 PM, "CGarcia@arhmf.com" <CGarcia@arhmf.com> wrote:

Good afternoon Juan Carlos,

Mr. Avila has a meeting out of the office on Wednesday morning.  He will be available after 2pm.

Cintya

**From:** Juan Carlos Cortes [mailto:juan.cortes@biscaynecapital.com]
**Sent:** Friday, September 19, 2014 11:42 AM
**To:** J.Demichelis@amicorp.com
**Cc:** Al Avila (X3570); Cintya Garcia (X3812); Erik Muelle (X3576); fhb@pbadvisor.net
**Subject:** Re: *Confidential: RE: Re: Privileged & Confidential

Good.

Al can you please confirm if possible to meet in the morning?

Juan C. Cortes

On Sep 19, 2014, at 9:14 AM, "J.Demichelis@amicorp.com"
<J.Demichelis@amicorp.com> wrote:

> Dear All,
>
> In order to have more time for our meeting, I will flight on Tuesday night (I will change my ticket). We can have the meeting in the morning.
>
> I will flight back to Curacao in the afternoon.
>
> Tks.
>
> JP
>
> *Best regards,*

<2C161661.gif **Juan Pablo Demichelis**
> *Senior Trust Officer*

Amicorp Curaçao B.V.
Pareraweg 45 | P.O. Box 4914 | Curaçao
Tel.: +599 (9) 434 3500 | Fax.: +599 (9) 434 3533 | Direct: +599(9) 434 3578 | VOIP:3578

J.Demichelis@amicorp.com I Skype: jpdmchls

www.amicorp.com

<2C804702.jpg>Please consider the environment before printing this message.

<graycol.gif>Juan Pablo Demichelis----09/19/2014 08:51:06 AM----Dear All, I will arrive to Miami around 12 pm on Wednesday.

From: **Juan Pablo Demichelis/Willemstad/AN/Amicorp**
To: **Juan Carlos Cortes <juan.cortes@biscaynecapital.com>**@DMZ
Cc: "savila@arhmf.com" <savila@arhmf.com>, "CGarcia@arhmf.com" <CGarcia@arhmf.com>, "EMuelle@arhmf.com"
<EMuelle@arhmf.com>, "fhb@pbadvisor.net" <fhb@pbadvisor.net>
Date: **09/19/2014 08:51 AM**
Subject: **\*Confidential: RE: Re: Privileged & Confidential**

Dear All,

I will arrive to Miami around 12 pm on Wednesday.

Tks.

JP

*Best regards,*

<2C161661.gif
>

**Juan Pablo Demichelis**
*Senior Trust Officer*

**Amicorp Curaçao B.V.**
Pareraweg 45 I P.O. Box 4914 I Curaçao
Tel.: +599 (9) 434 3500 I Fax.: +599 (9) 434 3533 I Direct: +599(9) 434 3578 I VOIP:3578

J.Demichelis@amicorp.com I Skype: jpdmchls

www.amicorp.com

<2C804702.jpg> Please consider the environment before printing this message.

<graycol.gif> Juan Carlos Cortes ---09/18/2014 02:14:47 PM---AI, Great. Wednesday works for me too. Lets wait for confirmation from Mr. Demichelis.

From: Juan Carlos Cortes <juan.cortes@biscaynecapital.com>
To: "aavila@arhmf.com" <aavila@arhmf.com>, "J.Demichelis@amicorp.com" <J.Demichelis@amicorp.com>
Cc: "EMuelle@arhmf.com" <EMuelle@arhmf.com>, "fhb@pbadvisor.net" <fhb@pbadvisor.net>, "CGarcia@arhmf.com" <CGarcia@arhmf.com>
Date: 09/18/2014 02:14 PM
Subject: RE: *Confidential: Re: Privileged & Confidential

---

AI,

Great. Wednesday works for me too. Lets wait for confirmation from Mr. Demichelis.

Regards,

Juan C. Cortes
Biscayne Capital

---

**From:** aavila@arhmf.com <aavila@arhmf.com>
**Sent:** Thursday, September 18, 2014 2:06 PM
**To:** Juan Carlos Cortes; J.Demichelis@amicorp.com

**Cc:** EMuelle@arhmf.com; fhb@pbadvisor.net; CGarcia@arhmf.com
**Subject:** RE: *Confidential: Re: Privileged & Confidential

I think that is a good idea. The best date for me is Wednesday the 24th but let me know what works for you and Mr. Demichelis. The Chart was prepared by Mr. Demichelis prior to our conversation and was not a result of our discussions. In principle the concept in Demichelis chart is very similar to our original proposed structure. We can reconcile the differences when we meet.
Regards
Al

**From:** Juan Carlos Cortes [mailto:juan.cortes@biscaynecapital.com]
**Sent:** Thursday, September 18, 2014 1:27 PM
**To:** J.Demichelis@amicorp.com; Al Avila (X3570)
**Cc:** Erik Muelle (X3576); Fernando Haberer
**Subject:** RE: *Confidential: Re: Privileged & Confidential

Al,

Mr. Demichelis has offered to travel to Miami early next week so we can all meet and go over the map and go into more detail about the language of the Deed of Trust.

I understand you are reviewing the language of the Deed sent by Mr. Demichelis. Can we please set aside time next week to meet face to face?

In the meantime I notice that the chart proposed by Demichelis differs from the chart I saw with you and Erik last time we met in your offices. Is this a consequence of your chat with Demichelis after our meeting?

Thank you,

Juan C. Cortes
Biscayne Capital

---

**From:** J.Demichelis@amicorp.com <J.Demichelis@amicorp.com>
**Sent:** Tuesday, September 16, 2014 5:12 PM
**To:** aavila@arhmf.com
**Cc:** Juan Carlos Cortes; 'emuelle@arhmf.com'; Bergson Simon
**Subject:** *Confidential: Re: Privileged & Confidential

Dear Alcides,

As per our call, please find attache*(See attached file: PROJECT BSC- 2014 – Alternative 7.ppt)*d the PPT present*(See attached file: VISTA Trust*

*Irrevocable_New.pdf)*ation and the VISTA trust template.

Do not hesitate to contact me for further clarification.

Thank you.

JP

*Best regards,*

<2C463402.jpg **Juan Pablo Demichelis**
> *Senior Trust Officer*

**Amicorp Curaçao B.V.**
Pareraweg 45 I P.O. Box 4914 I Curaçao
Tel.: +599 (9) 434 3500 I Fax.: +599 (9) 434 3533 I Direct: +599(9) 434 3578 I VOIP:3578

J.Demichelis@amicorp.com I Skype: jpdmchls

www.amicorp.com

<2C804702.jpg>Please consider the environment before printing this message.

<graycol.gif>Juan Carlos Cortes ---09/09/2014 01:20:29 PM---Juan Pablo, I am pleased to
introduce Mr. Alcides Avila and his associate Mr. Erik Muelle. As previo

From: Juan Carlos Cortes <juan.cortes@biscaynecapital.com>
To: "j.demichelis@amicorp.com" <j.demichelis@amicorp.com>
Cc: "eavila@srhmf.com" <eavila@srhmf.com>, "emuelle@srhmf.com" <emuelle@srhmf.com>
Date: 09/09/2014 01:20 PM
Subject: Privileged & Confidential

Juan Pablo,

I am pleased to introduce Mr. Alcides Avila and his associate Mr. Erik Muelle. As previously discussed, Alcides is the attorney leading the strategy in re Trust formation. Alcides is preparing a " road map". Yesterday we tried to call you in order to go over the general concepts of this road map.

I have asked Alcides to send us a draft / sample of the Trust Certificate language, so we can review in advance.

In any case, we expect to have the map ready by the end of this week. Alcides will circulate and then, we can arrange a call to go over the details. I have also requested Alcides to reach out to you in case he needs your input. Please send us your coordinates.

Regards,

Juan C. Cortes

CAUTION: Any information contained in this communication is intended for the use of the named addressee(s). All information contained in this communication is not intended or construed as an offer, solicitation, or a recommendation to purchase any security nor does it constitute any form of trade confirmation. Advice, suggestions or views presented in this communication are not necessarily those of Biscayne Capital nor do they warrant a complete or accurate statement. Do not send time-sensitive, action-oriented messages such as transaction orders, fund transfer instructions or check stop payment requests, as it is our policy not to accept such items electronically. If you are not an intended party to this communication, please notify the sender and delete/destroy any and all copies of this communication. Unintended recipients shall not review, reproduce, disseminate nor disclose any information contained in this communication.

Amicorp Group does not provide tax or legal advice to its clients. Any opinions contained in this email should not be construed or interpreted as advice provided by Amicorp Group.

CONFIDENTIALITY NOTE: This e-mail is intended only for the person or entity
to which it is addressed and contains information that is privileged,

# Exhibit "D"





TRUSTS AND FOUNDATIONS

# British Virgin Islands Trusts

The BVI VISTA trust is a trust for settlors who wish to retain control over the administration management and devolution of underlying companies.

# VISTA Trusts

The VISTA trust - a trust created and subject to the Virgin Islands Special Trusts Act 2003 as amended - is a modern form of trust for holding shares in companies where it is intended that:

a)    the shares will be held indefinitely; and

b)    the trustee is not intended, other than in special and defined circumstances, to intervene in the conduct of the affairs of the underlying company or companies.

Normally a trustee must act as a "prudent investor" in respect of shares it holds in a company. This will require the trustee to monitor the company's management and performance. It may also require the trustee to sell the shares to maximise the financial advantage of the trust assets, or diversify risk. These trustee duties can easily conflict with the interests of 'family' trading and investment companies.

VISTA removes these conflicts and problems by enabling clients to create VISTA trusts under whose terms the trustees have no duties to interfere in the management of the company or realise the latent value of the shares.

## Summary of VISTA's main provisions

- The shares of a company held by a VISTA trust may be held indefinitely.
- The directors or other parties of the underlying company can manage the

affairs of the company without interference from the trustee.

- The application of VISTA is to shares in BVI companies only.
- Shares held subject to VISTA are held on trust to retain the shares.
- Notwithstanding the trust to retain, the trustee is given power (subject to the precise terms of the trust) to dispose of the shares with the consent of the directors, or the settlor, or any other person nominated in the trust instrument.
- The trustee is expressly prohibited from exercising its voting power or other powers attaching to the shares so as to interfere in the management of the company or the conduct of the business.

Exceptionally, if an "interested person" e.g. a beneficiary, calls upon the VISTA trustee to intervene in the company's affairs then the trustee must do so if the interested person has a "permitted ground of complaint" which must be specified in the trust instrument.

The settlor can lay down rules regulating the appointment, removal and remuneration of directors of the company owned by the VISTA trust. The rules, contained in the VISTA trust, could for example nominate a successor director (if the settlor is the director) on the settlor-director's death.

The terms of the VISTA trust can call on the trustee to transfer the shares of the underlying BVI company to specified beneficiaries on the death of the settlor. In this way, the shares can pass to family members on the death of the settlor without the settlor therefore having to make a will and this measure avoids lengthy and costly probate issues, as well as providing

potential tax advantages and peace of mind.

# VISTA trusts and non-BVI companies

It has already been noted that VISTA can only apply (directly) to BVI company shares.

If shares in non-BVI companies and/or other assets are to be held, these should be held by a BVI company the shares of which are held directly by the trustee of the VISTA trust.

When to set up VISTA trusts?

- Where the trust assets or underlying assets of a trust are to comprise shares in a trading company.
- Where the settlor is not prepared to relinquish control over administration and management of the company.
- Where the underlying assets of the trust comprise an unconventional investment portfolio e.g. ships, aeroplanes, futures, options and assets of a commercial nature.
- Where the settlor wishes particular assets not to be disposed of e.g. family heirlooms or family companies.
- Securitisations and off-balance sheet structures.

# Contact Us

Exhibit "E"

| | |
|---|---|
| **From:** | fhaberer |
| **To:** | Fernando Haberer; Alfonso Pena robirosa |
| **Subject:** | MIRAR: Projects / Action points |
| **Date:** | Sunday, June 3, 2018 10:05:39 PM |

On 2/24/16, 3:33 AM, "Derk Scheltema" <D.Scheltema@amicorp.com> wrote:

Hi Fernando,

Was a pleasure meeting you last Friday.

A brief summary of what we can work on together:

1) Romay family trusts. As communicated by Juan Pablo I propose the following
A) Trustee will pay itself this week the transfer in fees and annual fees as has been quoted.
B) Regarding the transfer in fee excess, I'll be lobbying to stick to the transfer in fee quoted, even though significantly more time was spent. No promises as we rely in approval of NZ office.
C) Regarding the Annual Fee excess, we will sit with the family to clearly explain and substantiate the excess time spent, which we feel is due.
D) Online access to the investment accounts is a must where the banks provide this. It makes the admin much more efficient for us.

2) SBH and Vanguardia trust. We will set up a call / meeting this week in Miami (involving the trustee in a call) to discuss the modus operandi of the ongoing distributions / accounting and administration purposes. Does it suit you to meet on Thursday at 1:30. We can come to the Biscayne office.

3) Intermediary agreement between Amicorp and Biscayne. Juan Pablo will send our standard format which we can then discuss. The idea would be to create a team to face off to all Biscayne FAs, provide online access to their clients entity files, and actively market to all Biscayne FAs to incorporate new structures and move existing structures to Amicorp. We can do an onboarding process of analysis of CRS impact with the clients, and 'tax compliance' restructuring during that process.

4) Collaboration on DCSX share / equity issues through your Citi / Trust platform in Ireland. Pls send me fees and workings.

5) Biscayne purchasing a brokerage seat on the DCSX. We'll send you a proposal on that. I think that you can structure a lot of interesting transactions on the DCSX. As a member, you / we are able to influence the rules and regulations on the exchange. We can create a good platform for listings in Latam. The Singapore / Hong Kong of our region!

6) An economical solution for clients with less than 1m. We have a Pooled Omnibus Investment Trust structure on Barbados, which may work for some. We can create something similar on Curacao through the Segregated Trust Cell company. We'll send you separate information on this.

7) Amibond issue via your platform to investors. Documentation is being finalized on our end, will send it to you once done.

8) Potential Reverse Merger / IPO. We are open to your thoughts on how you would be able to facilitate the process, steps involved, requirements towards the issuer, and fees.

9) Amicorp Bank & Trust partnership. Taking a partial stake in the bank with the purpose to:
A) expand the licence into a full banking licence
B) grow the bank's assets held

C) grow the number of clients that receive brokerage / asset management services at the bank leveraging both our networks.

10) Purchasing a bank (other than ABT). We can assist in finding and closing a target.

I may have missed something, but seems like a nice list to start working out further.

I think it would also make a lot of sense for you to come see the operation on Curacao.

We're happy to invite you over when it suits your agenda.

Derk

Sent from my iPhone

------------------------------------------------------------------
Amicorp Group does not provide tax or legal advice to its clients.
Any opinions contained in this email should not be construed or interpreted as advice provided by Amicorp Group.

CONFIDENTIALITY NOTE: This e-mail is intended only for the person or entity to which it is addressed and contains information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information contained herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail in error, please delete this message and immediately notify the sender by e-mail.
NOTE: This e-mail does not constitute an electronic signature and the sender does not intend to enter into any agreement by way of this e-mail, unless otherwise expressly provided by sender within this e-mail.